[No. J.D. 2.   En Banc.   May 22, 1986.]

*In the Matter of the Disciplinary Proceeding
Against* FRED R. STAPLES, *Judge of
the Superior Court for Benton
and Franklin Counties.*

*Fred R. Staples,* pro se.

*Milburn D. Kight,* for Judicial Qualifications Commission.

DORE, J.—We hold that the recommended admonishment of Judge Fred R. Staples by a 4–to–3 vote of the Judicial Qualifications Commission is unwarranted. We refuse to admonish Judge Fred R. Staples.

## FACTS

Benton County has the large majority of its population in or near Kennewick, but its county seat is located 35 miles away in Prosser. The majority of the county government offices were moved to Kennewick, although about one-quarter of them remain in Prosser. The Benton County Superior Court was always held in Prosser, but in 1980 the County authorized construction of a Justice Center in Kennewick. Pursuant to RCW 2.08.030, the County received written authorization from then Chief Justice Utter of this court allowing the superior court to be held in Kennewick upon completion of the Kennewick Justice Center. The Supreme Court's order further required modernization of the Prosser facility so that superior court could also be held there after modernization and completion of both courthouses.

In July 1984 the county commissioners allotted over $2 million to update the Prosser courthouse although the Supreme Court order required only a $500,000 expenditure. Judge Staples disagreed with that decision. After the completion of the Kennewick Justice Center, the overwhelming majority of cases were held in Kennewick and none of the superior court judges wished to hold court in Prosser as it required over a 30–minute drive and needed government support offices were often unavailable.

Judge Staples decided that the best way to solve this problem would be to move the county seat to Kennewick, thereby making the Supreme Court's order concerning the

Prosser modernization moot. Article 11, section 2 of the Washington Constitution provides that a three–fifths–majority vote of the county population is needed in order to move a county seat. To effectuate the county seat move Judge Staples circulated petitions, made campaign speeches, organized a committee, and ran ads in local newspapers. Judge Staples, however, did not engage in any fund–raising activities. The campaign was controversial and highly visible, and fell a few thousand votes short of the 60 percent favorable vote needed.

## DISCIPLINARY ACTION

The Judicial Qualifications Commission filed a disciplinary action against Judge Staples for violating Canon 7 of the Code of Judicial Conduct by engaging in political activity not designed to better the administration of justice. A fact–finding hearing was held in which the Commission refused to admit a letter signed by all of the other judges of Benton County, which stated that "the location of the county seat in Benton County has a direct and substantial impact upon [its] judicial system." This was a factual affidavit which should have been considered.

By a 4–to–3 majority, the Commission ruled that by clear and cogent evidence Judge Staples' actions were not designed for the better administration of justice; it concluded that he had violated Canon 7. The Commission initially recommended that Judge Staples be privately admonished, but he refused to accept the Commission's ruling. The Commission then recommended that this court publicly admonish Judge Staples.

This dispute revolves around the proper interpretation of Canon 7 of the Code of Judicial Conduct, which provides in part:

(A) Political Conduct in General.

(1) A judge or a candidate for election to judicial office should not:

(a) act as a leader or hold any office in a political organization;

(b) make speeches for a political organization or

candidate or publicly endorse a nonjudicial candidate for public office;

. . .

(4) A judge should not engage in any other political activity except on behalf of measures to improve the law, the legal system, or the administration of justice.

Judge Staples and the Commission have stipulated that the campaign to move the county seat was political, but dispute whether the exception in Canon 7(A)(4) regarding political activities designed for the improvement of the administration of justice includes the Judge's actions.

Judge Staples has steadfastly maintained that he campaigned to move the county seat because such a move would greatly improve the administration of justice. Judge Staples has contended that although Benton County received permission to hold court in Kennewick, by the terms of RCW 2.08.030, the superior court must "hold their sessions at the county seats . . . and at such other places within the county . . . with the approval of the chief justice of the supreme court of this state . . ." Because of the Benton County judges' experience with a new courthouse in Kennewick which could adequately fulfill the judicial needs of the county, Judge Staples believed it inefficient to have a modernized parallel facility in Prosser.

Judge Staples further believed that a constitutional crisis would occur if Benton County was, by virtue of the majority of county offices being located in Kennewick, operating its government de facto from a city other than the official county seat. Judge Staples cites *State ex rel. Lemon v. Langlie,* 45 Wn.2d 82, 273 P.2d 464 (1954), which held that certain state executive offices must be located in the state capital and not Seattle, for the proposition that certain county offices must likewise be located in the county seat, and not the largest, most convenient city. The fact that the Benton County offices now primarily exist in Kennewick could open the County to a costly constitutional confrontation which would be avoided by moving the county seat.

The majority of the Commission challenged Judge Sta-

ples' reasoning. The Commission has maintained that the "Washington Supreme Court has authorized the conduct of court sessions at [Kennewick]. Thus, removal of the county seat to Kennewick to authorize court sessions was not a measure to improve the law, the legal system, or the administration of justice." Finding of fact 7. The Commission has asserted, quite simply, that since the County could hold court in Kennewick because of Chief Justice Utter's ruling, Judge Staples had no excuse to justify his political activity.

██ ██ The Commission's argument appears to be based on two premises. First, the constitutional crisis which Judge Staples believes to exist does not in fact exist,[1] or at least would not affect the law, legal system, or administration of justice. This interpretation would require a very narrow reading of "administration of justice" to include measures directly relating to the actual administering of the law (*i.e.,* court rules, procedure), and not measures such as this which would have a significant effect on the way in which justice is administered. Secondly the Commission based its decision on its belief that Chief Justice Utter's ruling that the superior court could be held in either Kennewick or Prosser ended any problem about whether court could constitutionally be held in Kennewick. Report of Proceedings, at 62. Therefore, the Commission concluded that: the fact that court also had to be held regularly in Prosser pursuant to RCW 2.08.030 did not affect the administration of justice in Kennewick.

Canon 7(A)(4) has apparently never been interpreted in any jurisdiction to determine whether the Commission's very narrow interpretation of the improvement of law, the legal system or the administration of justice is justifiable. Commentators on this Canon, however, have indicated certain policy reasons behind Canon 7(A), which help interpret this section. Three different purposes have been given for

---

[1]We do not decide the validity of Judge Staples' belief that a constitutional crisis exists.

the prohibition in Canon 7(A) against political activity:

(1) participation in outside activities so extensive that the time and energy available for the primary obligation are measurably impaired; (2) participation in out-of-court activities that may lead to actual bias or the appearance of prejudgment of issues likely to come before the court; and (3) actions that impair the dignity and esteem in which the court should be held.

McKay, *The Judiciary and Nonjudicial Activities,* 35 Law & Contemp. Probs. 9, 12 (1970). Similar concerns are voiced in E. Thode, *Reporter's Note to Code of Judicial Conduct* (1973). *See also* Note, *Extra Judicial Activity of Supreme Court Justices,* 22 Stan. L. Rev. 587 (1970).

The first policy concern is that the judge might spend too much time involved in politics to the prejudice of his judicial duties. There is no allegation nor evidence that Judge *Staples did not* conscientiously perform his judicial duties during the campaign. We hold that this concern is not relevant here.

The second and third policy rationales for limiting judicial political activity are to prevent the possibility that bias or the appearance of bias may result, or that the esteem and dignity of the court may be adversely affected. These concerns are justified when considering partisan political activity, as the very nature of partisan activity would give the impression that political considerations might affect the judge's disposition of the case. Such a danger, however, simply does not exist in this kind of situation, in which nonpartisan, civic-minded political activity is involved. We hold that Canon 7(A)(4) applies only to *partisan* political activities.

Furthermore, judges have specifically been allowed to enter political activity designed for the better administration of justice. This provision exists because "of the important and sometimes essential role of judges in legal reform." *Reporter's Note,* at 97. If judges would have to remain silent, with their necessary expertise in matters of improving the law, then beneficial legal reform would be seriously

impaired. Furthermore, a judge does not lose his rights as a citizen by assuming the bench.

The Commission has held that Judge Staples' actions nevertheless do not fit within the "administration of justice" exclusion. We disagree. All the judges of Benton County agreed that duplicate courthouses would effectuate duplicate costs and time delays, and greatly inconvenience the majority of taxpayers. Furthermore, Judge Staples, with his experience in the judicial system, would necessarily have an added awareness of the difficulties of such parallel courthouses. We conclude it would be contrary to the purpose of the exclusion provided in Canon 7 to prohibit a judge from attempting reform under such circumstances.

## Conclusion

The history of our judicial system is full of instances in which judges have promoted what would broadly be described as the better administration of justice. Judge Learned Hand passionately supported legal aid societies. Justice Robert Finley of our court devoted his life to the improvement of judicial administration and court management. Judge Irving Kaufman wrote extensively of the benefits of judges engaging in efforts to reform the legal system and the dangers of judicial monasticism. He wrote:

> In view of the growing concern about outside activities of judges, we think it important to reaffirm the principle that judges should not become monastic, but should continue to work with the organized bar and the law schools of this country in efforts to improve the administration of justice. Judicial reform is no more a sport for the weak–hearted than it is for the short–winded. If judges should falter now in face of the agitation of the moment, much of the motive power behind court reform would be lost.

> The Canons of Judicial Ethics deserve careful study and possible revision, but the task should be undertaken calmly and deliberately, with full realization of the great value of judicial participation in the betterment of the law and legal institutions.

Edwards, *Commentary on Judicial Ethics*, 38 Fordham L.

912

Rev. 259, 274 (1969), quoting Kaufman & Karlen, *4 Inst. of Jud. Ad. Rep.* 1 (1969).

We dismiss the charge filed against Judge Staples. The narrow interpretation of Canon 7(A)(4) which the Commission urges we adopt would have a chilling effect on the ability of those individuals who have the best knowledge of the judicial system from freely participating in its improvement.

DOLLIVER, C.J., and UTTER, BRACHTENBACH, PEARSON, ANDERSEN, CALLOW, GOODLOE, and DURHAM, JJ., concur.