554 A.2d 493

**In the Matter of The Honorable Joseph P. BRAIG Court of Common Pleas Philadelphia County.**

Supreme Court of Pennsylvania.

Argued Oct. 25, 1988.

Decided Feb. 21, 1989.

See also 702 F.Supp. 547.

410

James E. Beasley, Philadelphia, for respondent.

Robert L. Keuch, Executive Director, Harrisburg, for J.I.R.B.

Before NIX, C.J., and FLAHERTY, ZAPPALA, PAPADAKOS and STOUT, JJ.

## OPINION OF THE COURT

STOUT, Justice.

This case has the same genesis as the eight cases reported as *In re Cunningham*, 517 Pa. 417, 538 A.2d 473 (1988). Fortunately, it has a happier ending.

In this case, as in *Cunningham*, the Judicial Inquiry and Review Board [hereinafter "J.I.R.B." or "Board"] instituted formal proceedings against Respondent, a judge of the Court of Common Pleas of Philadelphia County, following public disclosures involving a labor racketeering investigation conducted by the Federal Bureau of Investigation.

On October 23, 1986, a federal grand jury sitting in Philadelphia returned a multi-count indictment charging nineteen individuals associated with Roofers' Union Local 30–30B with racketeering. Among other things, the grand jury charged that Stephen Traitz, Jr., the business manager for the Union, and other Union representatives used money obtained through kickbacks to make cash payments to public officials, including members of the Philadelphia judiciary.

The Board requested and obtained information developed in connection with the federal investigation. On December 10, 1986, the Board issued to Respondent a letter of inquiry, pursuant to J.I.R.B. Rule 1(b), stating that the Board was inquiring into allegations that in 1985 Respondent had, "accepted a cash gift of $500 from a representative of the Roofers' Union, Local 30–30B, and that on [his] financial disclosure statement for that year [he] reported a gift of $350 from the President of the Union and his wife. The alleged conduct would appear to involve possible violations of Canons 1, 2 and 5(C)(1) of the Code of Judicial Conduct."

Formal charges were filed on January 15, 1987, alleging that Respondent had violated the Constitution of the Commonwealth of Pennsylvania, Article 5, section 17(b) in that:

Justices and judges shall not engage in any activity prohibited by law and shall not violate any canon of legal or judicial ethics prescribed by the Supreme Court.

The Board charged specifically that Respondent had violated Canons 1, 2 and 5(C)(1) of the Code of Judicial Conduct in that, "In the year 1985, the Respondent accepted *a cash gift* from a representative of the Roofers' Union, Local

30–30B."[1]   (emphasis and footnote added).

On January 29, 1987, the charges were amended to allege a violation of Canon 7[2] as follows:

Respondent, in the latter part of 1985, attempted to influence the selection of the new Police Commissioner by the Mayor of Philadelphia, doing so through an intermediary or intermediaries because of his, the Respondent's, recognition that he is not allowed to be involved with politics.

1.  Those Canons provide:

**CANON 1.   A JUDGE SHOULD UPHOLD THE INTEGRITY AND INDEPENDENCE OF THE JUDICIARY**

An independent and honorable judiciary is indispensable to justice in our society.   A judge should participate in establishing, maintaining, and enforcing, and should himself observe, high standards of conduct so that the integrity and independence of the judiciary may be preserved.   The provisions of this Code should be construed and applied to further that objective.

**CANON 2.   A JUDGE SHOULD AVOID IMPROPRIETY AND THE APPEARANCE OF IMPROPRIETY IN ALL HIS ACTIVITIES**

**A.**   A judge should respect and comply with the law and should conduct himself at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary.

**B.**   A judge should not allow his family, social, or other relationships to influence his judicial conduct or judgment.   He should not lend the prestige of his office to advance the private interests of others;   nor should he convey or knowingly permit others to convey the impression that they are in a special position to influence him.   He should not testify voluntarily as a character witness.

**CANON 5.   A JUDGE SHOULD REGULATE HIS EXTRA–JUDICIAL ACTIVITIES TO MINIMIZE THE RISK OF CONFLICT WITH HIS JUDICIAL DUTIES**

. . . .

**C.   Financial Activities**

(1) A judge should refrain from financial and business dealings that tend to reflect adversely on his impartiality, interfere with the proper performance of his judicial duties, exploit his judicial position, or involve him in frequent transactions with lawyers or persons likely to come before the court on which he serves.

2.  The relevant section of Canon 7 is 7(A)(4) which provides:

**CANON 7.   A JUDGE SHOULD REFRAIN FROM POLITICAL ACTIVITY INAPPROPRIATE TO HIS JUDICIAL OFFICE**

**A.   Political Conduct in General**

. . . .

(4) A judge should not engage in any other political activity except on behalf of measures to improve the law, the legal system, or the administration of justice.

These charges stemmed from Braig's having simultaneously entertained, at a barbeque, a long-standing friend and professor of criminal law and Senator Hardy Williams.

After a three-day hearing by a three-member panel of the nine-member Board, the entire Board concluded that Respondent had violated Canon 1 in that he failed to maintain high standards of conduct so that the integrity and independence of the judiciary may be preserved and in that he failed to disclose the $500 cash gift on the Statement of Financial Interest, that Respondent violated Canon 2 in that he conveyed to Traitz the impression that Traitz was in a special position to influence him and in that the failure to disclose the full amount of the cash gift decreased public confidence in the integrity of the judiciary, that Respondent violated Canon 5 in that his conduct constituted a financial dealing that tended to reflect adversely on his impartiality, and that Respondent violated Canon 7 by engaging in political activity when he attempted to influence the selection of the Police Commissioner.[3]

The Board recommended the sanction of removal.

### Standard of Review

We must review de novo the record of the Board[4] to determine whether the charges have been established by clear and convincing evidence. *In re Judicial Inquiry and Review Bd. v. Snyder*, 514 Pa. 142, 523 A.2d 294, *cert. denied sub nom., Snyder v. Pennsylvania Judicial Inquiry & Review Bd.*, — U.S. —, 108 S.Ct. 100, 98 L.Ed.2d 61 (1987). The standard of clear and convincing evidence means testimony that is so clear, direct, weighty, and con-

---

3. One Board member dissented from the conclusion of the Board that the exchange of Christmas gifts violated the Code and three Board members dissented from the conclusion that Respondent's efforts on behalf of a candidate for Police Commissioner violated Canon 7 of the Code. Three Board members agreed that the sanction of removal was too harsh.

4. Counsel for the Board presented no testimony but relied largely on the transcripts of wiretaps received from the federal investigators. Braig testified and was examined at length. He presented ten witnesses.

vincing as to enable the trier of fact to come to a clear conviction, without hesitancy, of the truth of the precise facts in issue. *La Rocca Trust*, 411 Pa. 633, 640, 192 A.2d 409, 413 (1963); *In re Justin S.*, 375 Pa.Super. 88, 543 A.2d 1192 (1988).

We begin with a review of the admissible evidence relevant to the allegations of violations of Canons 1, 2, and 5(C)(1).

### Canons 1, 2 and 5(C)(1)

#### Evidence of Traitz–Braig Friendship and Chronology of Events

1. The Traitz family and the Braig family have been friends for four generations. Traitz' grandfather dated Braig's grandmother in bygone years. Traitz' grandfather and Braig's maternal grandfather, Pasquale Palermo, came from the same neighborhood. Pasquale Palermo was a professional boxer as were members of the Traitz family. Braig's daughters and Traitz' daughters-in-law are friends and riding competitors.

2. Braig was Commissioner of Licenses and Inspections in 1971 and was Deputy Mayor in 1972. It was in one of those years that he met Traitz. They became friends in 1981 when Braig, who is interested in boxing, became a member of the Board of Directors of the Montgomery County Boys' Club, a Club which was organized and run by the Roofers' Union and by Traitz and his wife. Braig was an active, and not a letter-head, Board member. He involved his wife and children in the Club's activities.

3. On October 1, 1983, Mr. and Mrs. Traitz attended the Braigs' wedding and had pictures taken with them.

4. On Christmas, 1983, Mr. and Mrs. Traitz gave Braig a windbreaker jacket for Christmas and gave monogrammed jackets to his wife and to each of his two daughters.

5. On Christmas 1983, Braig gave a silver Christmas tree ornament to the Traitz family.

6. On Christmas 1984, Traitz gave Braig a monogrammed jacket.

7. On Christmas 1984, the Braigs gave the Traitz family a silver bell for the dinner table. The bell was purchased from Bailey, Banks and Biddle.

8. In 1984, some of the graduates of the Montgomery County Boys' Club went to the Bahamas for a three-day boxing match sponsored by the Roofers' Union. Braig was invited to go free. He declined the offer, paid his own way, and exhibited his cancelled check to the Board.

9. The year 1985 marked a retention election for Braig. He asked Traitz to be the labor coordinator, on behalf of the Roofers' Union and other labor unions, for his campaign.

10. On March 17, 1985, St. Patrick's Day, Braig his wife and his two daughters had dinner with the Traitz family at its Trooper, Pennsylvania farm. After dinner, Kris, Braig's fifteen-year-old daughter, wanted to ride one of the terrain vehicles, a three-wheeled bike apparatus, owned by the Traitz family. Donna, a daughter of Steve and Barbara Traitz, put Kris on the terrain vehicle. It went out of control and fell twenty feet over an embankment fracturing her arm. Traitz took full responsibility for the accident and felt devastated by it.

11. Since 1981 Braig maintained a policy of recusing himself from cases involving roofers. His law clerks routinely screened out cases identifiable as roofers' cases without consulting Braig. On October 7, 1985, after offering to recuse himself from a roofer's case, *Currie v. Miller,* which had inadvertently, reached him for a jury trial, Braig presided over a settlement which, by agreement of all parties, was fair. The plaintiff, a member of the Roofers' Union, sought the policy limit of $100,000. The defendant's insurer offered $32,000. The case settled for $40,000. Defense counsel testified that he rejected the recusal offer without any pressure whatsoever from Braig.

12. Braig refused to allow the Roofers' Union to pay off his campaign debts. He also refused campaign donations

from individual lawyers, and never used his official letterhead stationery for private correspondence.

13. On October 8, 1985, Braig went to Traitz' office to discuss the mechanics of the election. After Traitz appeared upset by two telephone calls he received, one relating to a friend who was ill with cancer and the other relating to one of his daughters who was seriously ill in the hospital, Braig told him good news about a roofer who had appeared before him the day before and who had obtained a $40,000 settlement.

14. On that October 8th visit, Braig discussed with Traitz who the best physician might be for the illness from which his daughter suffered. After leaving Traitz' office, he and Mrs. Braig sent flowers to the hospitalized daughter.

15. In October 1985, the Braigs attended the wedding of one of the Traitz daughters and gave a wedding gift worth approximately $100.

16. From time to time, Mr. Traitz gave Dr. Braig, Braig's wife, who is a teacher, hats and clothing for underprivileged children in her classes. He donated woolen caps for winter as well as summer caps. Dr. Braig took pictures of the recipients.

17. From time to time, Braig's daughter, Jennifer, would ride in horse shows with the Traitz' daughters-in-law. She liked the Traitz' farm and barn where they kept the horses and often she would have dinner with them after riding in shows. Pictures were taken of Jennifer's riding. Some of them Traitz had enlarged and hung in his office.

18. On December 17, 1985, Braig telephoned Traitz to arrange a time to deliver a Christmas gift. The appointment was made for December 18.

19. On December 18, when Braig arrived at the Traitz office, Traitz gave Braig two envelopes, each of which pictured a horse and each of which had an identically handwritten note. The notes, which were addressed to Braig's two daughters, Jennifer and Kristin, read:

We have arranged for you a gift of 9 riding lessons at Shannondell Farms with a professional rider and instructor, Nancy McClure [a U.S. equestrian rider who was two farms away and who gave lessons to Traitz' daughters-in-law.]

To make arrangement for lessons call:

666–5924 Nancy's house

666–6979 barn

Merry Christmas, Steve and Barbara.

Exhibit R–17, 4–10–87.

20. Traitz asked Braig to look at the daughters' gifts which he did.

21. The envelope addressed to each daughter also contained a $100 gift certificate for the riding lessons.

22. In addition, Traitz gave Braig two other envelopes, for him and his wife, which he did not open. The envelopes contained $300 or $350.

23. On that December 18th visit to Traitz' office, Braig gave him a gift from himself and a box from his daughter, Jennifer. The box contained a pewter horse ornament which Braig had bought at Caldwell's. This was in appreciation for the help Traitz had given Jennifer with her riding and with getting a summer job.

24. The Braigs were surprised at the generosity of the gifts from the Traitz family but attributed that generosity, in part, to guilt feelings on their part for the accident Kristin Braig suffered after Donna Traitz placed her on the terrain vehicle which had fallen over the cliff, and partly due to the generosity of the Traitz which they had seen exhibited on other occasions.

25. On Christmas Eve, 1985, the Braigs telephoned the Traitz to thank them for the gifts. Braig, his wife, and his two daughters also expressed their gratitude.

26. In January 1986, the Braigs invited the Traitz to dinner. The Traitz went to the Braig home and, after a

brief visit, they left for an excellent restaurant. The Braigs were the hosts, selected the restaurant, and intended to pay the bill, but Traitz insisted on paying it.

27. On April 23, 1986, Braig filed the Statement of Financial Interest for 1985 in which he stated he and Mrs. Braig and family had received $350 cash in an exchange of Christmas gifts from "Mr. and Mrs. Traitz and family."

28. Braig's excellent reputation of honesty and integrity was attested by several character witnesses including Robert A. O'Connell, now Chief Deputy U.S. Marshal for the Western District of New York, William J. O'Brien, Esq., a partner in Pepper, Hamilton and Sheetz, and Robert A. Rasnick, Esq., his law clerk from 1976–1979 and from 1981 to the present.

## Discussion of Facts and Law

■ There is no admissible evidence that Judge Braig accepted any cash amount in excess of that amount declared on his Statement of Financial Interest.[5] As a matter of fact, in the formal charge he was not accused of having accepted $500 but rather was charged only with having "accepted a cash gift." Six months before the J.I.R.B.'s letter of inquiry, and nine months before the formal charge of acceptance of a cash gift was brought against Respondent, he had disclosed on his Statement the acceptance of a $350 cash gift from Mr. and Mrs. Traitz.

5. The Board relied on two items of inadmissible hearsay for its conclusion that Braig received $500: a conversation of November 11, 1985 among Traitz and four other men in which Traitz said, "... send Joe Braig $500 to clean ... [his] old bills up," Electronic Surveillance Transcripts, Vol. 1, 11–11–85 at 5, and a conversation of December 5, 1985 among Traitz and four other men in which Traitz, in referring to envelopes which were being filled with $500 each said, "And Joe Braig, five...." id. at 23, "[a]nd my fifth one is Judge Braig." Id. at 37. Braig was not present on these occasions and no inference may be drawn against him from the contents of these conversations as they constitute classic hearsay in the form of out-of-court declarations offered for the truth of the matters asserted. See Commonwealth v. Coleman, 458 Pa. 112, 115, 326 A.2d 387, 388 (1974) (plurality opinion).

That the $350 was a gift from Traitz, the friend, and not from Traitz, the roofer, is clear from the surrounding circumstances of intergenerational friendship between the families, the current close association between the families which manifested itself in many ways—prior exchanges of gifts, visits, each family's attendance at ceremonial occasions of the other's family, an interest in each other's children, dinner invitations, etc.

The physical act of passing money is an act of ambiguity. It may be the receipt of a loan, the repayment of a loan, a bribe, a gift, or any one of a myriad other transactions. The ambiguity of that act may be cleared by the verbal part of it if such exists.[6] In this case, the verbal part of the act indicates clearly that the passing of the envelopes was the passing of a gift.

Braig's steadfast policy against accepting money is demonstrated clearly by his refusal to accept payment from the Montgomery County Boys' Club, with which Traitz is associated, for a trip to the Bahamas, his refusal to allow the union to pay off his campaign debts, his refusal to accept money from individual lawyers, even from his good friend of twenty-five years, Professor Rogovin, who no longer is in private practice, and his refusal to use official stationery, provided by the Commonwealth, for private correspondence. The transcribed conversation of December 18, 1985, consumed 43½ pages not one word of which had to do with Braig and the Roofers' Union. One and one-half pages, which form the Appendix attached hereto, consisted of Traitz' talking about the gifts. Fourteen pages consisted of Traitz' talking about the farm he recently had purchased, and the remaining pages recorded discussion of various

6. In order to use words as verbal acts, four conditions must be met:
   1. the conduct to be characterized by the words must be *independently material to the issue;*
   2. the conduct must be *equivocal;*
   3. the words must aid in *giving legal significance to the conduct,* and
   4. the words *must accompany the conduct.*
   6 J. Wigmore, *Evidence,* § 1772, at 268 (Chadbourn rev. ed. 1976).

420

subjects.[7]

In *Cunningham,* it is written:

A gift to a friend could be legitimate, but only if the donee is able to establish (1) that the gift was given only in connection with that relationship and (2) that the donee is satisfied that the circumstances surrounding the acceptance of the gift would not create a reasonable basis for the donor to believe that the gift places the donor in a position to exert improper influence over the donee in the discharge of his legal duties.

*Id.,* 517 Pa. at 441, 538 A.2d at 486.

Whatever the amount Braig received, it was exactly as he typified, a gift from a friend which in no way demeaned his integrity or independence as a jurist or the public confidence in the integrity of the judiciary. There was no clear and convincing proof to the contrary. The charge under Canon 1 and that part of the charge under Canon 2 which relates to the monetary gift are dismissed.

The finding that Braig violated the second prong of Canon 2 by conveying to Traitz the impression that Traitz was in a special position to influence him must also be dismissed. We see no clear and convincing evidence to support that conclusion. Not only did the circumstances surrounding the acceptance of the gift leave no basis for the donor to believe he could exert improper influence over the donee in the discharge of his legal duties, but Braig's exhibition of total independence toward Traitz on prior occasions demonstrated he could not exert improper influence.

From a taped conversation of October 8, 1985, the J.I.R.B. found as a fact that Braig sought to convince Traitz that he had coerced an especially large settlement in favor of a

7. Some of the conversation, including the first part of it had been "minimized," a practice the FBI has of not recording what it considers to be "personal talk." N.T.J.I.R.B.Hrg., 4–9–87 at 64. It is doubtful that when Braig entered Traitz' office he began the conversation without even a greeting and by saying, "Here, this is, ah, the box there, that's from me ... and this is from Jennifer, okay?" Electronic Surveillance Transcripts, Vol. II, 12–18–85 at 2.

union roofer, and concluded as a matter of law that the "improper nature" of acceptance of the cash [at Christmas] in the unmarked business-type envelopes "was intensified by the circumstance that it occurred two months after the Respondent conveyed in a conversation with Traitz the impression that his relationship to Traitz influenced his handling of a case." J.I.R.B. Final Report and Recommendation at 24 (Conclusion of Law 1).

We discuss that case, *Currie v. Miller*, in detail and include *in extenso* the conversation which followed the next day.

Frank Jakobowski, attorney for defendant, Miller, testified on behalf of Braig. Mr. Jakobowski testified that his eighteen-year-old client had been driving an automobile on a rainy Saturday night when he hit a pedestrian, Currie, whom he did not see. The first notice of the accident he had was when Currie landed on, and broke, the windshield. Mr. Currie suffered a crushed nerve in his right leg in the tibia area which was giving him great difficulty walking, climbing ladders, and tending to his daily duties. Currie's wife witnessed the accident.

Mr. Jakobowski said the liability picture looked bad from the defense standpoint and the exposure was rather great. From time to time, he had discussed the case with plaintiff's counsel and had tried to settle it. Plaintiff's counsel wanted the policy limits of $100,000. Jakobowski said, "There was no doubt in my mind that there would be recovery. The best we could hope for was a compromise of some kind because of possible contributory negligence." N.T. J.I.R.B. Hrg., 4–10–87 at 379.

When the case came before Braig for trial, it was disclosed during a conference that Currie was a roofer and that he couldn't climb ladders. Currie was afraid to be on a roof because his leg might collapse and he might roll off the roof. That was the first time that it was revealed to Braig that the plaintiff was a roofer.

According to Jakobowski, Braig immediately said: "You realize that I'm running for retention and that I'm being

supported by the Roofers' Union." *Id.* at 380. He offered to withdraw from the case but Jakobowski indicated that he had no objection to his remaining.

Jakobowski said that plaintiff's counsel wanted more money than the insurance company put on the case. Braig talked to plaintiff's counsel and then called him, Jakobowski, back and said, "Sixty-five thousand dollars to settle this case." *Id.* at 384. To this, Jakobowski responded, "No way. I can't get the $65,000." *Id.* Jakobowski testified, " 'One of the important features of our defense is that about the time that this case was assigned for trial the Supreme Court came down with a decision saying that the wife, who had a claim for emotional distress, had to reach a threshold—that is $750.00—just as any individual would have to in order to maintain a suit.' This was not a consortium claim", Jakobowski said, "[t]hat took a big bite out of the plaintiff's case." *Id.*

Braig called plaintiff's counsel back in and, after discussion with him, called Jakobowski in and said, "Forty thousand will do it. See if you can get it." *Id.*

Jakobowski telephoned the company and, inasmuch as they had authorized $32,000 before he went to the conference, he asked, "Do you want to roll the dice for another $8,000? It's not worth it." *Id.* The Company replied, "Go ahead and settle it." *Id.*

According to Jakobowski, during the conference, Braig in no way pressured him or promised him anything in an attempt to settle the case.

The following day, Braig went to Traitz' office to discuss the mechanics of the election. Soon after his arrival, Traitz received two telephone calls, one of which was about his daughter who had gone to the hospital for emergency surgery and the other of which was about a close friend who was dying of cancer. Traitz was very upset and, Braig testified, in order to cheer him, he told him about the case of the roofer. He stated that it was just a coincidence that he had had the roofer's case the day before he went to Traitz' office and said that he did not tell Traitz the name of

the roofer when asked because he did not consider that any of Traitz' business.

The conversation of October 8, as recorded, follows:

BRAIG: What a real coincidence. I had a matter before one yesterday, for a conference—brought the lawyers in. And in the course of the conference, ah, they were already to go to try the case. Ah, the, ah, they're discussing with me the pros and cons of the case, you know. And I'm trying to settle the case, right? So I say, what's the guy do for a living? So he said he's a roofer. Right? I said is he a union roofer? He said yeah, he works at local so and so. I said what? You know, ah, here is his damages and whatever have you. So, make a long story short, they offered the guy 20 grand to settle the case. About a half hour later when he left, satisfied, he had 40 grand.

TRAITZ: Who was it?

BRAIG: Forget it.

TRAITZ: What was his name?

BRAIG: I'll tell you some other time. These are all just nice guys. You know.

TRAITZ: You can't tell me his name?

BRAIG: Yeah, no, later.

TRAITZ: You are a nice guy.

BRAIG: Well, it just happened, you know, ah, just in the course of conversation. And, of course, it was the appropriate thing. It was fair, you know.

TRAITZ: Ain't much get by you.

BRAIG: It was very fair, you know. It waš very fair.

TRAITZ: You're like a roving linebacker.

BRAIG: And the defense attorney was, after we discussed everything, was very happy to pay that, and get out of there.

TRAITZ: I bet that vocabulary you musta unleashed on him, hey?

BRAIG: Just try to convince him of the lack of merit in his position, that's all.

TRAITZ: (Laughing) I bet how nice.

BRAIG: And, you know, those things come up. He didn't get any special treatment. He just got fair treatment. That's all.

TRAITZ: There's another sharp guy like you, and he's our lawyer and he really admires you. So that's how I know what league you are in.

Electronic Surveillance Transcripts, Vol. I, 10-8-85 at 1-2.

Even though the conversation, as recorded, indicates that Braig told Traitz they "offered the guy 20 grand to settle the case," *id.* at 1, a review of the record indicates that the offer was $32,000 which, after negotiation became $40,000. Plaintiff, at first, had demanded the policy limit of $100,000.

During the conversation, even though Traitz asked Braig three times to identify the roofer involved in the case, he refused because, in his opinion, it was none of Traitz' business. In addition, Braig stressed to Traitz the fairness of the settlement as he repeated: "It was the appropriate thing. It was fair, you know." Again he said, "it was very fair, you know. It was very fair." He also said, "He didn't get any special treatment. He just got fair treatment, that's all." *Id.* at 2.

Instead of giving Traitz the impression that he was in a special position to influence the jurist, we think Braig's refusal to divulge the name of the plaintiff despite Traitz' three requests, and Braig's reiteration of the fairness of the settlement, without any special treatment, dictate the opposite conclusion. Under the clear and convincing evidence standard, the remaining charge under Canon 2 must fall.

■ The finding of a violation of Canon 5(C)(1), that Braig's conduct constituted a financial dealing that tended to reflect adversely on his impartiality is dismissed. It is not supported by clear and convincing evidence for the same reasons that the finding of violations of Canons 1 and 2 was not.

## Canon 7

### "Political Activities" Regarding Selection of Police Commissioner

The evidence which purported to support the finding of violation of Canon 7 had to do with the selection of a Police Commissioner to succeed Commissioner Sambor.

The Mayor of Philadelphia established a nonpartisan committee to conduct a nationwide search for a Commissioner of competence. Several people suggested to Charles H. Rogovin, a professor of criminal law and procedure at Temple University School of Law, that he should apply.[8]

■ Sometime in the summer of 1985, Braig had a backyard barbeque at his home. This affair was attended by Professor Rogovin and by Senator Hardy Williams. Professor Rogovin, who has known Braig for twenty-five years, mentioned to him that several people had suggested that he apply to be Police Commissioner. Braig asked him if he were interested to which Professor Rogovin replied, "I think I am. What do you think about it?" N.T. J.I.R.B. Hrg., 4–10–87 at 265. Braig's response was "It's not for me to decide. It's a question of whether you are interested. If you are, you ought to pursue it. To the extent that you meet people, you ought to let them know." *Id.*

---

**8.** Professor Rogovin's experience was outstanding. At various times he has served as Assistant Attorney General in charge of Organized Crime and Chief of the Criminal Division in the Massachusetts Attorney General's Office under Elliott Richardson, and served, after appointment by President Johnson and confirmation by the Senate, as Administrator of the Law Enforcement Assistance Administration in the U.S. Department of Justice (LEAA). He was appointed the first managing director and president of the Police Foundation, funded by the Ford Foundation with approximately $30 million for work in the urban police field and dedicated to improving the response of urban law enforcement in the United States. After studying one year as a fellow at the Kennedy Institution of Politics at Harvard, he was appointed to President Reagan's Organized Crime Commission and is one of five appointed members of the Pennsylvania Crime Commission. He has authored and co-authored several publications dealing with crime including a chapter on organized crime for the International City Management Association.

Coincidentally Senator Hardy Williams, whom Rogovin had known for many years, was at the barbeque. Braig mentioned to Professor Rogovin that the Senator was close to Mayor Goode. Braig also mentioned to the Senator that Professor Rogovin had expressed interest in the position. Professor Rogovin spoke to Senator Williams who arranged a meeting for him with the Mayor. The Mayor and the managing director met with Professor Rogovin, for an hour and a half, beginning at 7 a.m. on Thanksgiving morning. A few days thereafter, a corporate executive who was on the bipartisan search committee interviewed Professor Rogovin about the job. When another Commissioner finally was selected, either Professor Rogovin or Senator Williams telephoned Braig and advised him.

The activities of Braig regarding the selection of the Police Commissioner were *de minimis*, nonpartisan, and within the exception of Canon 7(A)(4) which permits judges to be politically active "on behalf of measures to improve the law, the legal system, or the administration of justice." Certainly the concern about and the activity in support of selecting a competent Police Commissioner fall well within this exception. *In re Staples*, 105 Wash.2d 905, 719 P.2d 558 (1986). *See also* E. Thode, *Reporter's Notes to Code of Judicial Conduct*, at 97 (ABA, 1973); J. Shaman & J. Reiter, *Political Activities of Judges*, 8 Judicial Conduct Rep. 1 (1986). Moreover, the prohibition of Canon 7(A)(4) applies only to partisan political activities. *See e.g., In re Staples, supra.*

Because no one of the charges brought against Braig was proved by clear and convincing evidence, all of them are dismissed.

LARSEN and McDERMOTT, JJ., did not participate in the consideration or decision of this case.

ZAPPALA, J., files a concurring opinion.

PAPADAKOS, J., files a dissenting opinion.

APPENDIX

BRAIG: Here. This is, ah, the box there, that's from me ... and this is from Jennifer, okay?

TRAITZ: Wait'll you see what you got.

BRAIG: Well, this is from Jen for you. Okay? And she sent a card to the house.

TRAITZ: Okay. Show you what I got for her ... I hope we spelt that right.

BRAIG: Yeah.

TRAITZ: Okay. Now ... I hope your kids go for this.

BRAIG: Yeah. Remember (UI) Neilson (phonetic)?

TRAITZ: Yeah. Well, his, his mom has a riding stable there and I got a girl by the name of Nancy McClure. She's a United States' Equestrian rider. She gives my two daughter-in-laws....

(MINIMIZED)

BRAIG: Alright. Well, they'll put this away until the ...

TRAITZ: Whenever they're ready.

BRAIG: Yeah. Yeah.

TRAITZ: And alls they gotta do is call.

BRAIG: Yeah. (UI)

TRAITZ: The little girl's name is Nancy McClure. She's a United States' Equestrian rider. She's given Angela and, and Angel lessons ...

BRAIG: That's wonderful.

TRAITZ: ... in jumpin' and all and it's the farm, two farms away from me.

BRAIG: Right.

TRAITZ: They can go over whenever they want. Call Nancy and Nancy'll, like the day before, call when she wants to go.

BRAIG: Oh, yeah. We'll, we'll work it all out, Steve. Yeah.

TRAITZ: And then they, then they go and there are nine lessons and ...

BRAIG: That's good. That's wonderful.

TRAITZ: .. and, and see how they like 'em. And that's for both of the girls.

BRAIG: Well, Jen, of course you know, she's serious. I mean, she's, she's ...

(MINIMIZED)

TRAITZ: Enjoy it. Yeah. What is it? Yeah. 1900.

(TRAITZ ON TELEPHONE—NOT TRANSCRIBED)

TRAITZ: He said to give ya' his best.

BRAIG: Good man.

TRAITZ: He's a good ... I thought, I snitched. He, he's, he's he's hard, you know. I, I, I, his girls are good. I said, "They're not allowed to take anything." I said ... he said, "What did you give 'em?" I said, "Nothin'!"

BRAIG: Yeah.

TRAITZ: Jesus Christ. I (UI) ...

BRAIG: Well, I'm glad that you're, ah, ah, pleased with this place.

TRAITZ: Let me, let me tell you what happened.

BRAIG: (UI)

TRAITZ: ... just, just so, anybody that puts any money in the bank or even "CDs", the interest that they charge on your interest, ...

BRAIG: Yeah.

Electronic Surveillance Transcripts, Vol. II, 12–18–85 at 2–3.

ZAPPALA, Justice, concurring.

In *In re Cunningham*, 517 Pa. 417, 538 A.2d 473 (1988), I wrote separately to express my concern with this Court's emphasis on the motivation of the donor in determining whether the receipt of gifts constituted a violation of the Code of Judicial Conduct. The majority held that gifts are not absolutely prohibited by the Code, and that the "legitimacy" of the gift could be demonstrated,

> ... *but only if the donee is able to establish* (1) that the gift was given only in connection with that relationship and (2) that the donee is satisfied that the circumstances

surrounding the acceptance of the gift would not create a reasonable basis for the donor to believe that the gift places the donor in a position to exert improper influence over the donee in the discharge of his legal duties.

517 Pa. at 441, 538 A.2d at 486 (Emphasis added).

I stated at that time, and reiterate now, that the impropriety of a judge's conduct does not depend upon the giver's intent. In placing the burden of proof on the *donee* to establish the legitimacy of the gift in the context of an existing social relationship, the *Cunningham* majority would discipline jurists not for their improper conduct, but for the improper motives of others. I believe wholeheartedly that the analysis underlying that conclusion is flawed.

This case so succinctly illustrates the untenable approach taken in *Cunningham*. Focusing the inquiry on discerning the motivation of Stephen Traitz, Jr., the majority concludes that $350 cash gift "... was a gift from Traitz, the friend, and not from Traitz, the roofer...." Majority opinion at 419. But its recitation of the facts demonstrates that the cash gift was an anomalous gift even in the context of the longstanding social relationship existing between the Braig and Traitz families.

While I agree with the result reached by the majority, it signifies a movement, however imperceptible, from requiring the donee to establish that the gift was given *only* in connection with that relationship. I do not think it coincidence that the $350 cash gift to Judge Braig was given by Stephen Traitz, Jr. at precisely the time that numerous members of the Philadelphia judiciary were given cash gifts by him as well. It is fortunate, indeed for Judge Braig that he was able to introduce sufficient independent evidence to persuade this Court that he was not in fact influenced by Traitz's conduct, for that conduct alone was no different than Traitz's conduct in *Cunningham*. This re-emphasizes the point which I addressed in my concurring opinion in *Cunningham*—because the motivations of the *donor* may be suspect in any situation, the impropriety of judicial conduct cannot rest on the donor's intent. In essence, the

judicial official is required to assert a negative in order to sustain his burden of proof.

PAPADAKOS, Justice, dissenting.

I must dissent to the disposition of this matter by the majority. Although I can agree that the record is woefully deficient in clear and convincing evidence to establish that Judge Braig acted improperly in accepting gifts from a known corrupting source, I fear our exoneration of Judge Braig at this time, without further investigation, will be misperceived by the public and lessen confidence in the integrity of our judiciary and its ability to police one another. Especially so since Judge Braig currently faces federal criminal charges arising out of circumstances closely paralleling the charges considered by the Judicial Inquiry and Review Board and this Court.

I would remand this matter to the Judicial Inquiry and Review Board to investigate further and determine the source of the funds used by Mr. Traitz to shower gifts upon Judge Braig over the years. Were these funds Union funds or personal funds of Mr. Traitz? Did Judge Braig, over the years of family friendship with Traitz, know the source of these funds or, under all the circumstances surrounding the corrupting influence of Mr. Traitz upon many colleagues of Judge Braig, should Judge Braig have known that he was being drawn into a situation by his "friend" which could only raise the spectre of gross impropriety? As the saying goes, with friends like that, who needs enemies?

The public and Judge Braig are equally entitled to a full and complete airing of all the facts surrounding the giving and receipt of cash and gifts from an importuning source. The dismissal of charges against Judge Braig on the grounds of insufficient evidence leaves much to be desired. Perhaps we must stay content with the realization that Judge Braig will remain off the bench under order of this Court while the federal charges are pending.