555 A.2d 1202

**In the Matter of the Honorable Esther R. SYLVESTER, Court of Common Pleas, Philadelphia County.**

Supreme Court of Pennsylvania.

Argued Oct. 26, 1988.

Filed March 3, 1989.

John Rogers Carroll, Philadelphia, for respondent.

Robert L. Keuch, Executive Director, for J.I.R.B.

Before NIX, C.J., and FLAHERTY, McDERMOTT, ZAPPALA, PAPADAKOS and STOUT, JJ.

## OPINION OF THE COURT

STOUT, Justice.

This is the tenth case having the same genesis as the eight cases reported as *In re Cunningham,* 517 Pa. 417, 538 A.2d 473 (1988). Like the ninth case, *In re Braig,* 520 Pa. 409, 554 A.2d 493 (1989), it has a happier ending.

As in *Cunningham,* the Judicial Inquiry and Review Board [hereinafter "J.I.R.B." or "Board"] instituted formal proceedings against Respondent, a judge of the Court of Common Pleas of Philadelphia County, following public disclosures resulting from a labor racketeering investigation conducted by the Federal Bureau of Investigation.

On October 23, 1986, a federal grand jury sitting in Philadelphia returned a multi-count indictment charging nineteen individuals associated with Roofers' Union Local 30–30B with racketeering. Among other things, the grand

jury charged that Stephen Traitz, Jr., the business manager for the Union, and other Union representatives, used money obtained through kickbacks to make cash payments to public officials, including members of the Philadelphia judiciary.

The Board requested and obtained information developed in connection with the federal investigation. On January 12, 1986, the Board issued Respondent a letter of inquiry, pursuant to Rule 1(b), Rules of Procedure Governing the Judicial Inquiry and Review Board [J.I.R.B. Rules], stating that the Board "had reason to believe the Respondent had received a cash gift from the Roofers' Union in 1985."

Formal charges, which were delayed because of the Hobbs Act trial pending against Respondent in federal court, were filed January 15, 1987, alleging that Respondent had violated the Constitution of the Commonwealth of Pennsylvania, article 5, section 17(b) in that:

> Justices and judges shall not engage in any activity prohibited by law and shall not violate any canon of legal or judicial ethics prescribed by the Supreme Court.

The Board charged specifically that Respondent had violated Canons 1, 2, and 5(C)(1) of the Code of Judicial Conduct in that: [1]

1. **CANON 1.  A JUDGE SHOULD UPHOLD THE INTEGRITY AND INDEPENDENCE OF THE JUDICIARY**
   An independent and honorable judiciary is indispensable to justice in our society.  A judge should participate in establishing, maintaining, and enforcing, and should himself observe, high standards of conduct so that the integrity and independence of the judiciary may be preserved.  The provisions of this Code should be construed and applied to further that objective.
   **CANON 2.  A JUDGE SHOULD AVOID IMPROPRIETY AND THE APPEARANCE OF IMPROPRIETY IN ALL HIS ACTIVITIES**
   **A.**  A judge should respect and comply with the law and should conduct himself at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary.
   **B.**  A judge should not allow his family, social, or other relationships to influence his judicial conduct or judgment.  He should not lend the prestige of his office to advance the private interests of others; nor should he convey or knowingly permit others to convey the impression that they are in a special position to influence him.  He should not testify voluntarily as a character witness.

(1) Respondent received $300 cash from the Roofers Union in December 1985 which, under the totality of circumstances, constituted a failure to preserve the integrity and independence of the judiciary;

(2) her receipt of these monies constituted a failure to observe the required high standards of conduct; and

(3) that her conduct failed to promote confidence in the integrity of the judiciary.

Following a one-day hearing before a panel of three members [2] of the nine-member Board, a majority of the Board concluded that:

1. Respondent's conduct in accepting money—whether or not in the form of a campaign contribution—during a conversation in which she was asked by the donor to corrupt her judicial office constitutes a violation of Canons 1, 2 and 5(C)(1) of the Code of Judicial Conduct.

2. Respondent's conduct in failing to return or failing to document the return of such improperly accepted money constitutes a violation of Canons 1, 2 and 5(C)(1) of the Code of Judicial Conduct.

Six members of the Board recommended the sanction of removal.

Three members of the Board, including two of the three panel members who heard the testimony, filed a Minority Report [3] in which they concluded:

**CANON 5. A JUDGE SHOULD REGULATE HIS EXTRA-JUDICIAL ACTIVITIES TO MINIMIZE THE RISK OF CONFLICT WITH HIS JUDICIAL DUTIES**

. . . .

**C. Financial Activities**

(1) A judge should refrain from financial and business dealings that tend to reflect adversely on his impartiality, interfere with the proper performance of his judicial duties, exploit his judicial position, or involve him in frequent transactions with lawyers or persons likely to come before the court on which he serves.

**2.** The three panel members were Judge Alex Bonavitacola, Chairman, Judge James Munley, and James H. Higgins, lay member.

**3.** The three members who filed the Minority Report were Judge Bonavitacola, Judge Munley, and Judge McEwen.

(1) The Respondent accepted an envelope from Traitz on December 20, 1985 under the impression that it contained a P.A.C. contribution to her campaign expenses.

(2) The Respondent, upon discovering the envelope contained $300 cash, had the same returned as expeditiously as possible via courier.

(3) The Respondent's receipt of the envelope was not under totality of circumstances, a violation of Canon 1, Canon 2 or Canon 5(C)(1).

## STANDARD OF REVIEW

We review *de novo* the record of the Board to determine whether the charges have been established by clear and convincing evidence. *In re Judicial Inquiry and Review Bd. v. Snyder*, 514 Pa. 142, 523 A.2d 294, *cert. denied sub nom., Snyder v. Pennsylvania Judicial Inquiry & Review Bd.*, 484 U.S. 829, 108 S.Ct. 100, 98 L.Ed.2d 61 (1987). The standard of clear and convincing evidence means testimony that is so clear, direct, weighty, and convincing as to enable the trier of fact to come to a clear conviction, without hesitancy, of the truth of the precise facts in issue. *La Rocca Trust*, 411 Pa. 633, 640, 192 A.2d 409, 413 (1963); *In re Justin S.*, 375 Pa.Super. 88, 543 A.2d 1192 (1988).

The Board presented no witnesses. It did present seventeen exhibits. One of the exhibits included the six-volume transcript of the trial of *United States v. Sylvester*, No. 86–00449–01, in which she was acquitted of charges brought under the Hobbs Act. Another exhibit was the Federal Bureau of Investigation's tape of the conversation of December 20, 1985, between Traitz and Respondent.

Respondent testified in her own behalf and was cross-examined at length. She also relied on the transcript testimony of 52 character witnesses who testified in her federal trial.

We, as mandated, review the record *de novo*, make findings of fact, and determine whether, in the totality of the circumstances, the charges of violations of Canons 1, 2 and

5(C)(1) have been established by clear and convincing evidence.

## FINDINGS OF FACT

*Esther Sylvester's Career in Law and Education*

After graduating from Rosemont College and Villanova Law School, Esther Sylvester's career was marked by the following events:

1964—practiced law with John Nulty in a defense, civil practice and later with James E. Beasley in a plaintiff's civil practice. N.T. J.I.R.B. Hrg. 11–23–87 at 42.

1970—entered the District Attorney's Office where she served four years under District Attorney Specter, a Republican, and four years under District Attorney Fitzpatrick, a Democrat. In the District Attorney's office she tried cases in the major trial unit, and the homicide unit. She became chief of the major trial division and ultimately deputy for investigations where she was in charge of overseeing grand jury investigations, undertaken by the District Attorney's office, of corruption, police brutality, white collar crimes, etc. *Id.* at 42–43.

1973—became a member of the Board of Trustees at Rosemont College. Trial Transcript 9–18–87 at 175.

1977 to 1981—taught a graduate course to attorneys at Temple University School of Law. Trial Transcript 9–21–87 at 172.

1978—joined City Solicitor's office where she served as Chief Counsel to the Philadelphia Police Department. N.T. J.I.R.B. Hrg. 11–23–87 at 43.

—took leave of absence from City Solicitor's office to serve as acting president of Rosemont College, a position to which she was elected by unanimous choice of the Board of Trustees. *Id.*

1979—returned to the City Solicitor's office briefly until a new administration came in and asked her to leave. *Id.*

1980 to 1983—went to Atlantic City in August where she was chief counsel to the Great Bay Hotel and Casino which, during her service, became the Sands. *Id.*

1983—returned to private practice and had an office in the Philadelphia Saving Fund Society at 12th and Market Streets. *Id.* at 75.

1985—ran for judicial office and was elected November 5. Trial Transcript 9–21–87 at 81.

1986—took oath of office and sworn in as judge of the Court of Common Pleas, January 6. *Id.*

—was indicted under the Hobbs Act, October 23, N.T. J.I.R.B. Hrg. 11–23–87 at 40.

1987—was charged formally with violations of Canons of Judicial Ethics, January 15.

—was ordered by this Court, under J.I.R.B. Rule 24, to cease all judicial duties on January 30.

—was brought to trial under the Hobbs Act on September 14. N.T. J.I.R.B. Hrg. at 40.

—was acquitted of Hobbs Act violations on September 23. *Id.*

1988—was found by the J.I.R.B., on August 4, to have violated Canons 1, 2, and 5(C)(1) of the Code of Judicial Conduct, with a recommendation for removal from office.

## Judicial Race of 1985

1. In 1985, there were seven vacancies on the Court of Common Pleas, Trial Transcript 9–18–87 at 86, which were sought by many lawyers of whom Respondent was one. *Id.*

2. Respondent received the endorsement of the Committee to Elect Women Judges, *id.* at 85, but did not receive the endorsement of the Democratic Party which endorsed seven men, including two Republicans. *Id.* at 87.

3. Some Democratic ward leaders felt the women had been treated unfairly and began to invite them to speak at ward meetings. *Id.* at 90.

4. Even though Respondent was not endorsed by the Democratic Party or by any of the building and trades unions, including the Roofers' Union, and received no money from any of them during the primary campaign, she won. *Id.* at 90.

5. After winning the primary election without party endorsement, Respondent became a member of the judicial slate and received the support of all of the Democratic ward leaders and of all of the unions. *Id.* at 92–93.

6. In July 1985, Pat Gillespie, the head of the building and trades council and a person known to Respondent, invited several candidates, including Respondent, to speak to the executive committee of the Council at the building and trades council building on Orthodox Street. *Id.* at 93.

7. Traitz was at that meeting and Respondent saw, but did not speak to, him. She never again saw him, or spoke to him, until December 20, 1985. *Id.* at 92.

8. Respondent was elected judge of the Court of Common Pleas in November, 1985, and was sworn in January, 1986. *Id.* at 81.

9. The Roofers' Union contributed $500 to her general election campaign. N.T. J.I.R.B. Hrg. 11–23–87 at 25.

10. At the end of the campaign Respondent had a $22,000 campaign debt which she paid out of her own funds. Trial Transcript 9–21–87 at 126.

*Events Between December 9 and 19, 1985*

1. On December 9, Traitz told his secretary he was going to call Respondent. Trial Transcript 9–15–87 at 89. He called several times and left messages on her answering machine. Trial Transcript 9–16–87 at 134. Later he complained that he could not get in touch with her. Trial Transcript 9–15–87 at 94.

2. On December 18, Traitz' secretary, Tina, at his direction, tried to reach Respondent to invite her to a union party. Trial Transcript 9–16–87 at 134–35.

3. Inasmsuch as Respondent did not know Stephen Traitz, she did not return his calls. Instead, she called

Robert Abbaline, chairman of Ward 40a, who was her sponsor and who had abhorred the unfairness of the Primary slate. Trial Transcript 9–18–87 at 95. She called to ask why Traitz would be telephoning her.

4. Mr. Abbaline explained to her that labor was the backbone of the Democratic Party and that Steve Traitz was one of its respected leaders. He told her that if Traitz wanted her to come up there and thank him she would have to go, otherwise she would be perceived as an ingrate inasmuch as labor worked hard to support her. *Id.* at 96.

5. On December 19, Respondent returned Traitz' calls and was invited to come to the Union Hall on December 20th. *Id.* at 96–97.

## *The Conversation of December 20, 1985*

1. The conversation of December 20, 1985, which was taped by the Federal Bureau of Investigation, when transcribed, covered 26½ pages. It touched on many subjects: the program he had for employing young people, even girls, in the roofing trade, the early retirement policy of the roofers, a party the roofers were giving for 4,000 children at their union hall, the outcome of the District Attorney's race, the Montgomery County Boxing Team, Traitz' position as co-chairman of Governor Thornburgh's Physical Fitness Committee, Traitz' persistent efforts to obtain pardons from the Governor for some of his men, and his willingness to place any kids, regardless of race, in his apprentice program as an alternative to incarceration, if they were recommended by Respondent. Electronic Surveillance Transcripts, Vol. II, 12–20–85 at 1–27.

2. The conversation also contained several offers to help clean up Respondent's campaign debts from PAC funds and reminders that Traitz would need a letter for that purpose. *Id.* at 1–2.

3. Throughout the conversation, Traitz so dominated and overwhelmed Respondent conversationally that she hardly could get a word in edgewise. *Id.* at 1–27.

4. Near the beginning of the conversation, Traitz pushed an envelope toward Respondent for the second time and said, "That's for, that's for Christmas." Even though Respondent did not take the envelope, she said, "Thank you so much." Traitz reiterated that he would need a letter to approve payment of her debts. *Id.* at 1–2; Trial Transcript 9–21–87 at 120.

5. Respondent pushed the sealed envelope, which she believed contained a campaign contribution, in the form of a check, back toward Traitz. Trial Transcript 9–18–87 at 109; Trial Transcript 9–21–87 at 120.

6. After discussing several irrelevant topics, Traitz observed that it was refreshing that she and "the other young lady" were going to be on the Bench. He told her he would never embarrass her. He said he would never come to her for drugs or sex crimes but he would come to her for a smack in the nose. Electronic Surveillance Transcripts, Vol. II, 12–20–85 at 14–15.

7. Respondent related a story she had been told by Pat Gillespie about another woman jurist who, upon seeing union men in the courtroom while one of their men was being tried, sent a representative to Gillespie with a note which read, "Your presence in this courtroom doesn't intimidate me." *Id.* at 15–17.

8. Respondent said that the point she was trying to make was that he had every right to be there and indeed to talk for his people. *Id.*

9. Traitz replied that if one of his guys came in front of her he would make it known and he said, "I know, if you know it's a roofer ... you're goin' at their best behalf." To this Respondent replied, "I'm gonna look." *Id.*

10. To that response, Traitz said, "And, if you can help, good. And if you can't I understand that. I understand that. I would never put you under no heat. What the

hell kind of a friend would I be[?]" To this Respondent said, "Yes, I agree." *Id.*

11. After further discussion about his willingness to put kids to work and assurances that he would never embarrass her, Traitz told Respondent to "Put that away will you." She responded, "I will get that into my bag right here." *Id.* at 23.

12. Thinking the envelope contained a campaign contribution, Respondent took it and left. Trial Transcript 9–21–87 at 92.

### Events After Conversation of December 20, 1985

1. Respondent opened the envelope when she arrived home on December 20, 1985. To her surprise it contained cash. She realized the contribution was improper in this form and she determined to return it. On Monday, December 23, 1985, Respondent gave the cash to Armond Mangino, whom she had known since the 70's, who had served as her trusted driver throughout the campaign and who became an employee in her Court. She directed Mr. Mangino to return the cash which he did. N.T. J.I.R.B. Hrg. at 30–33.

2. Mr. Mangino suffered a heart attack and died suddenly on March 20, 1986. Mr. Mangino was forty-eight years old when he died. He had no history of illness. *Id.* at 38.

### Character Witnesses

1. Respondent introduced the federal trial testimony of 52 character witnesses from varied walks of life. Many of them were unsolicited.[4] All of them testified to her excellent reputation for truthfulness, honesty, integrity, industry, and to the fact that she was not avaricious. J.I.R.B. Hrg. Exhibit Respondent–C.

---

4. Those who testified included many lawyers, two former district attorneys of Philadelphia, a priest, a sister, a member of the United States House of Representatives, a member of the Senate of Pennsylvania, a messenger, law professors with whom she had taught, a certified public accountant, police officials, business executives, and security officials.

2. In addition, twenty-one letters attesting to Respondent's law-abiding characteristics were presented. J.I.R.B. Hrg. Exhibits Respondent–A, Respondent–B.

3. Dr. Dorothy McKenna Brown, who became President of Rosemont College following Respondent's term as Acting President, testified that even though Respondent could have remained on the payroll as Acting President until August 6, 1979, she voluntarily signed off the payroll in June, 1979, in order to save the College money. A scholarship for excellence, to be given a student aspiring to be a lawyer, was established in her name with funding from a member of the Board of Rosemont College. Trial Transcript 9–21–87 at 4–5.

4. Ellen Duffy, Director of Human Services at the Sands Casino, testified as to the rigorous investigation to which Esther Sylvester was subjected before obtaining a key employee license. She had to demonstrate that her character was of utmost quality, that her integrity was unimpeachable, and that her reputation was excellent. *Id.* at 39–40.

5. Joseph Golden, Chief Inspector of the Philadelphia Police Detectives for many years before retirement in 1980, testified that Esther Sylvester's reputation was "absolutely excellent, impeccable, and that she was not money hungry." *Id.* at 45.

6. Benjamin Lerner, Esquire, Chief Defender of the Defender's Association of Philadelphia, testified that Esther Sylvester's reputation was "excellent, outstanding." *Id.* 55–56.

7. Samuel Rafino, a grocer from the Norristown neighborhood, in which Esther Sylvester grew up, testified that he had known her since 1948, that she began working for him when she was twelve years old, and that she was honest, efficient and a perfectionist. *Id.* at 186–87.

## DISCUSSION OF LAW AND FACTS

Preliminarily we note that even though charges of violations of Judicial Canons are not criminal in nature, the

teaching of *Commonwealth v. Castellana*, 277 Pa. 117, 121 A. 50 (1923), is instructive as to the value of character evidence to one accused. There Mr. Chief Justice Moschzisker wrote:

> One on trial for an offense ... is allowed to introduce evidence of his good reputation in any respect which has "proper relation to the subject matter" of the charge at issue.... ... Such evidence may of itself prove sufficient to acquit the accused ... or it may create a reasonable doubt of guilt and thus acquit ...; but to create or to clear up a doubt is "not the only office of evidence of good character, ... it is substantive evidence to be weighed and considered in connection with the other evidence in the case." ... This kind of proof is allowed to the defendant ... because ... one accused ... may be able to produce no evidence except his own oath and proof of good character to exculpate himself from the charge against him.

*Id.*, 277 Pa. at 122–23, 121 A. at 51–52 (citations omitted). *See Commonwealth v. Luther*, 317 Pa.Super. 41, 463 A.2d 1073 (1983); *Commonwealth v. Simler*, 320 Pa.Super. 342, 467 A.2d 355 (1983).

Here Respondent could offer no evidence except her oath and proof of good character. This proof of her unblemished and outstanding reputation for truth, honesty, integrity, and lack of avariciousness gave vivid meaning to the Solomonic wisdom that "A good name is rather to be chosen than great riches." Proverbs 22:1.

It is clear that one of Traitz' objectives in seeking a meeting with Respondent was to give her money. It is equally clear that the receipt of money had never entered her mind. The expression of gratitude for labor's support, at the urging of her political sponsor, was the sole reason for her meeting with Traitz. Traitz knew the requirement for PAC contributions, he knew there was cash in the sealed envelope, and he knew that the gift of cash was not a legal PAC contribution. Respondent also knew the requirements for PAC contributions but had no idea the envelope

contained the unacceptable cash rather than an acceptable check. Although given at Christmas, the envelope was received by Respondent in the belief, garnered from Traitz' persistent talk about PAC contributions, and his need for a letter in connection therewith, that it contained a PAC contribution. When the envelope was opened and its cash contents were revealed, Respondent returned it promptly.

Later in the conversation, when Traitz began talking about the roofers, he told Respondent he would come to her "for a smack in the nose," but that she would never see him for drugs or any sex crimes. At that point, she spoke at length, in parabolic form, and told him the story of another female judge who allegedly had sent a note to some union officials who were in the courtroom during a trial of a roofer. The note bore the message, "Your presence in this courtroom doesn't intimidate me." Respondent concluded by saying, "I think you have every right to be there and indeed to talk for your people." When Traitz said he would make known to her if a roofer were in court and opined, ". . . if you know it's a roofer . . . you're goin' at their best behalf," she replied, "I'm gonna look."

A few minutes later, she took the envelope, which was offered to her the third time, and left.

In these circumstances, we find no violation, by clear and convincing evidence, of either Canon 1, or Canon 2, the general canons of the Code of Judicial Conduct. Respondent promised no special treatment to roofer-defendants but promised only that she would do what every good judge should do—"look." She also expressed the law correctly when she said that people have every right to come to court and to "talk" for their people. People are in court every day, whether they are employers, co-workers, union representatives, relatives, friends, clergymen or whoever, "talking" for their people. The presence and expression of such witnesses in no way diminish the independence or integrity of the judiciary.

Similarly we find no violation of Canon 5(C)(1). In reaching this finding we are mindful that PAC contributions not

only are legal but also that they are accepted by most candidates in political contests, whether in the executive, legislative or judicial branches of government. The acceptance of a contribution, which was perceived by Respondent to be a PAC contribution, was not a financial dealing which would reflect adversely on her impartiality. Any such perception by others, if such existed, was dispelled by her immediate return of the money.

The charges of violation of Canons 1, 2, and 5(C)(1) were not established by clear and convincing evidence and, therefore, must be dismissed.

LARSEN, J., did not participate in the consideration or decision of this case.