J-S81001-16

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| IN THE INTEREST OF: A.J.B., A MINOR | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: A.C., FATHER | No. 1571 EDA 2016 |

Appeal from the Decree April 29, 2016
In the Court of Common Pleas of Philadelphia County
Family Court at No(s): CP-51-AP-0000793-2015
FID: 51-FN-4466-2013

BEFORE:  BOWES AND MOULTON, JJ., AND STEVENS, P.J.E.*

MEMORANDUM BY BOWES                    **FILED DECEMBER 19, 2016**

A.C. ("Father") appeals from the April 29, 2016 decree involuntarily terminating his parental rights to his three-year-old daughter, A.J.B.  We affirm.

During June 2013, A.J.B. was born ten weeks premature and underweight, and both she and R.W. ("Mother") tested positive for opiates. A.J.B. remained in the hospital for approximately two and one-half months before she was discharged to Mother.[1]  While the Philadelphia Department of

---

[1] Although it is unclear whether A.J.B.'s current behavioral issues are related to her postnatal condition, the record reveals that A.J.B. receives early childhood intervention services and has been evaluated by behavioral health specialists.

---

* Former Justice specially assigned to the Superior Court.

Human Services ("DHS") became involved with the family immediately after A.J.B.'s birth, it did not initiate in-home protective services until July 22, 2013, when it became apparent that Mother could not care for A.J.B., and her three half-siblings who are not related to Father.[2] Father, who was uncertain of A.J.B.'s parentage, did not reside with the family; however, he accompanied Mother to the hospital to visit the child.

The juvenile court matter progressed, and on November 21, 2013, A.J.B. and her half-sisters were adjudicated dependent. The children were committed to DHS care and custody and the agency placed them together in what is now their pre-adoptive foster home. Father did not interact with the DHS until August 2015, nearly two years later, when he contacted the agency. Father testified that he "was aware of the situation" for as long as one year prior to contacting the agency. N.T., 4/29/16, at 12. While he had suspected A.J.B. was his daughter, he was unsure, and did not interact with Mother except for receiving photographs of the child from Mother's Facebook page. Father was not involved with A.J.B. following her discharge from the hospital, and he failed to provide any legitimate explanation for his inaction. DHS advised Father of the next two hearing dates and encouraged him to

---

[2] The trial court terminated Mother's rights to A.J.B. and her half-siblings on March 2016. This appeal does not concern that order or the status of the other children.

appear, identify himself to the court, and request visitation and a paternity test. Father missed the hearings because his schedule was too busy.

During a subsequent planning meeting, in which Father participated by telephone, the agency encouraged him to establish paternity, maintain involvement with dependency proceedings, form a relationship with his daughter, and document that he had a suitable residence. Father failed to achieve the goals of the family service plan ("FSP"). As outlined, *infra*, Father did not participate consistently in the dependency hearings, establish a relationship with A.J.B., attend visitation, or document that he had obtained a suitable residence.

On March 14, 2016, the trial court ordered a paternity test and weekly supervised visitations.[3] Father missed the first three visitations, and out of the six supervised visitations that were offered between March 14, 2016 and April 29, 2016, he attended only two. The first visit with A.J.B., occurred on April 14, 2016; however, Father terminated the visitation after ten minutes because the nearly three-year-old child cried inconsolably and refused to sit with him. The subsequent visitation was canceled because Father arrived twenty-five minutes late. Father simply failed to attend the final visitation, which had been scheduled for April 28, 2016.

_____

[3] The results of the paternity test revealed 99.99% probability that Father was A.J.B.'s biological parent.

Meanwhile, having terminated Mother's parental rights to A.J.B. and her half-siblings during March 2016, on April 12, 2016, DHS filed a petition to terminate Father's parental rights to his daughter pursuant to § 2511 (a)(1), (2), (5), and (8) of the Adoption Act. During the ensuing trial, the agency presented the testimony of Khaliah Moody, the caseworker assigned to the family since October 15, 2014, and introduced portions of the juvenile court record. Father testified on his own behalf. In addition to presenting specific examples of Father's failure to perform parental duties, Ms. Moody addressed A.J.B.'s life with her pre-adoptive foster parents, testified that they were satisfying A.J.B.'s specialized needs, and opined that A.J.B. would not suffer irreparable harm if the court terminated Father's parental rights so that she could be adopted along with her half-siblings. The trial court made express credibility determinations in favor of Ms. Moody. *See* Trial Court Opinion, 6/22/16, at unnumbered page 5. At the conclusion of the trial, the court terminated Father's parental rights to A.J.B. pursuant to § 2511(a)(1), (2) and (b). This timely appeal followed.

Father complied with Pa.R.A.P. 1925(a)(2)(i) by filing a concise statement of errors complained of on appeal concomitant with his notice of appeal. He presented two questions, which he reiterates on appeal as follows:

> 1. Whether the Trial Court erred in [t]erminating Appellant's [p]arental [r]ights under 23 Pa.C.S.A. [§] 2511(a)(1) [when] the evidence [was] insufficient to establish [that] Father had

evidenced a settled purpose of relinquishing parental claim, or . . . refused or failed to perform parental duties.

2.    Whether the Trial Court erred in [t]erminating Appellant's [p]arental [r]ights under 23 Pa.C.S.A. [§] 2511(a)(2) [when] the evidence [was] insufficient to establish [that] Father caused [A.J.B.] to be without essential parental care [that] could . . . not have been remedied.

Father's brief at 5.

Our standard of review is well settled.

The standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. The trial court's decision, however, should not be reversed merely because the record would support a different result. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (citations and quotation marks omitted).

Involuntary termination of parental rights is governed by § 2511 of the Adoption Act, 23 Pa.C.S. §§ 2101-2938. As the party petitioning for termination of parental rights, DHS "must prove the statutory criteria for that termination by at least clear and convincing evidence." *In re T.R.,* 465 A.2d 642, 644 (Pa. 1983). Clear and convincing evidence is defined as "testimony that is so clear, direct, weighty, and convincing as to enable the

trier of fact to come to a clear conviction, without hesitancy, of the truth of the precise facts in issue." *Matter of Sylvester*, 555 A.2d 1202, 1203–04 (Pa. 1989).

As noted, the trial court terminated Father's parental rights pursuant to § 2511(a)(1), (2) and (b), which provide as follows.

> **(a) General Rule**.—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> > (1)  The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.
> >
> > (2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.
> >
> > . . . .
>
> **(b) Other considerations.**--The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child.  The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent.  With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S. § 2511(a)(1), (2) and (b).

As "we need only agree with [the court's] decision as to any one subsection in order to affirm the termination of parental rights[,]" we review the trial court analysis under §2511(a)(1). *See In re B.L.W.*, 843 A.2d 380, 384 (Pa.Super. 2004) (*en banc*).

With respect to § 2511(a)(1), this Court has explained,

> A court may terminate parental rights under Section 2511(a)(1) where the parent demonstrates a settled purpose to relinquish parental claim to a child or fails to perform parental duties for at least the six months prior to the filing of the termination petition. The court should consider the entire background of the case[.]

*In re A.S.*, 11 A.3d 473, 482 (Pa. Super. 2010) (citations omitted).

Regarding the definition of "parental duties," we have stated,

> There is no simple or easy definition of parental duties. Parental duty is best understood in relation to the needs of a child. A child needs love, protection, guidance, and support. These needs, physical and emotional, cannot be met by a merely passive interest in the development of the child. Thus, this court has held that the parental obligation is a positive duty which requires affirmative performance.
>
>       . . . .
>
> Parental duty requires that the parent act affirmatively with good faith interest and effort, and not yield to every problem, in order to maintain the parent-child relationship to the best of his or her ability, even in difficult circumstances. A parent must utilize all available resources to preserve the parental relationship, and must exercise reasonable firmness in resisting obstacles placed in the path of maintaining the parent-child relationship. Parental rights are not preserved by waiting for a more suitable or convenient time to perform one's parental responsibilities while others provide the child with . . . her physical and emotional needs.

*In re B.,N.M.*, 856 A.2d 847, 855 (Pa.Super. 2004) (citations omitted) (quoting *In re C.M.S., 832 A.2d 457*, 462 (Pa.Super. 2003).

Once the evidence establishes a failure to perform parental duties or a settled purpose of relinquishing parental rights, the court must then engage in three additional lines of inquiry: (1) the parent's explanation for his or her conduct; (2) the post-abandonment contact between parent and child; and (3) consideration of the effect of termination of parental rights on the child pursuant to Section 2511(b). *In re Z.S.W.*, 946 A.2d 726, 730 (Pa.Super. 2008).

Instantly, the record supports the trial court's conclusion that Father failed to perform his parental duties. During the termination hearing, Ms. Moody testified that Father knew the child was born during August 2013, visited the child in the hospital prior to discharge, and as early as August 2014, he suspected that he was the birth father. Nevertheless, he did nothing for two years while the child initially struggled in Mother's care and then was the subject of dependency proceedings. Significantly, the evidence demonstrates that Father was aware that his daughter was in DHS care because he possessed a photograph of the child that was taken during one of Mother's supervised visitations.

Even after Father revealed himself to the agency during August 2015, he failed to take affirmative steps to perform his parental duties, he rebuffed

DHS' initial encouragement to participate in the dependency proceedings, and he neglected to make in-person contact with his daughter until April 2016. Father participated in the case planning meeting that produced his FSP goals, but he was too busy to attend several other hearings.

Moreover, when Father finally secured supervised visitations with his daughter, he missed all but two of them, and terminated one of those visits prematurely because he could not cope with the child's crying. The other visitation was canceled by DHS because Father was twenty-five minutes late. Finally, in addition to neglecting his FSP objectives relating to remaining involved in the dependency proceedings and promoting a positive relationship with the child, Father failed even to document whether he had obtained suitable housing.

In sum, the certified record demonstrates that Father was either unwilling or unable to perform his parental duties throughout A.J.B.'s lifetime and specifically during the six months preceding the agency's petition to terminate parental rights. In addition to yielding his parental obligations, Father failed to utilize visitation, respond to the agency's outreach, or take any affirmative steps consistent with his parental duty to provide his daughter love, protection, guidance, and support.

Having found clear and convincing evidence that Father failed to perform his parental duties, we next consider his explanation for his inaction and any post-abandonment contact he had with A.J.B. As it relates to the

latter inquiry, we observe that Father has only had two face-to-face meetings with his daughter: the first happened in the hospital immediately after A.J.B.'s birth; and the other ten-minute interaction occurred approximately three years later. Thus, there is no evidence of any meaningful post-abandonment contact to consider.

In relation to the remaining component of § 2511(a)(1), Father asserts three primary explanations for his inaction. First, Father contends that he did not know that he was A.J.B.'s birth Father, and insinuates that his parental duties were not triggered until the court verified his paternity. Second, he claims that Mother was dishonest about the child's parentage and concealed her and A.J.B.'s whereabouts, presumably to defeat Father's ability to confirm paternity. Finally, Father asserts that he was too busy, and DHS refused to accommodate his schedule.

We find unavailing Father's initial contention that he was not obligated to perform parental duties until his paternity was confirmed. In reality, Father had an affirmative obligation to be involved in his daughter's life. **See In re Z.S.W.**, **supra** (rejecting the trial court's rationale that a possible birth father was not required to perform parental duties until paternity is verified). Thus, this excuse fails.

Similarly, Father's reliance upon Mother's alleged malfeasance is equally unpersuasive. Father claims the Mother told him that A.J.B.'s birth father was dead, and he asserts that he did not know how to contact Mother

- 10 -

to inquire about the child. The certified record does not support Father's contention that he could not have located Mother with a minimum effort and ascertained the truth about A.J.B.'s parentage. For example, during the trial, Father testified that he was in contact with his and mother's mutual friends, who had kept him abreast of his daughter's condition while she was in the hospital. N.T., 4/29/16, at 28. Likewise, Father stated that he had a brief exchange with Mother at a McDonald's restaurant following her discharge from the hospital. *Id*. at 45. Most tellingly, however, Father testified that he had been in contact with Mother via social media and that Mother provided him digital photos of A.J.B., which Ms. Moody confirmed had been taken during Mother's supervised visitation. *Id*. at 15, 29. Thus, Father's trial testimony belies his instant contention that he was unable to locate Mother. It is beyond question that, had Father desired to perform his parental duties, he could have raised the issue during the in-person exchange, or attempted to contact Mother through mutual friends or by social media.

Father's third excuse fares no better. Father complains that his commercial cleaning businesses and his obligations toward another child interfered with his efforts to perform his parental duties to A.J.B. For example, when asked why he was unable to accept Ms. Moody's invitation to attend A.J.B.'s dependency hearings, Father simply stated that he "had so much going on [that] he could not make it." *Id*. at 31. Likewise, in relation

to the missed visitations, he complained that DHS refused to accommodate his request to introduce A.J.B. to her half-sister. *Id*. at 46. Father's complaints are unconvincing for two reasons. First, the certified record demonstrates that DHS and the pre-adoptive foster parents modified the visitations schedule to conform with father's work requirements. *Id*. at 24. Thus, this aspect of the his explanation is factually defective.

Moreover, Father failed to explain how his daily responsibilities and the stresses of everyday life impacted his ability to fulfill his parental obligations to A.J.B. Stated plainly, assuming *arguendo*, that Father's work schedule and commitment to his other child impeded his ability to perform, Father did not provide any evidence to demonstrate that he exercised any degree of firmness to overcome those obstacles. To the contrary, our review of the certified record confirms that DHS established by clear and convincing evidence that Father failed to utilize available resources to establish a parental relationship or exercise reasonable firmness to resist the obstacles that he claims impeded his ability to perform his parental duties. No relief is due.

Finally, while Father does not present an issue on appeal with respect to § 2511(b), we review the trial court's needs and welfare analysis in an abundance of caution. We note that no parental bond exists between A.J.B. and Father. Rather, as the trial court accurately observed in its opinion, the meaningful parental bond in this case exists between A.J.B. and her pre-

adoptive foster parents, with whom she has resided since 2013. We highlight the court's reasoning as follows:

> In the instant matter, the child does not have a parental bond with the father (N.T., 4- 29 -16. p. 22). The child has been in her pre- adoptive foster home for over two years. She shares the pre[-]adoptive home with her three siblings. She looks to the foster parent to meet her basic needs. Additionally, the child receives specialized services through early childhood intervention which are taken care of by the foster family (N.T., 4- 29 -16. p. 21). Moreover, the child would not suffer irreparable harm if the father's rights were terminated (N.T., 4- 29 -16, p. 22). Finally, terminating the parental rights of the father would be in the best interest of the child (N.T., 4- 29 -16, p. 21).

Trial Court Opinion, 6/22/16, at unnumbered page 5. As the certified record supports the trial court's factual determinations, we do not disturb its conclusion that terminating Father parental rights best satisfies A.J.B.'s developmental, physical and emotional needs and welfare.

Decree affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 12/19/2016

- 13 -