J-S39029-17

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| IN RE: ADOPTION OF D.K.I., A MINOR | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: K.A.I., NATURAL MOTHER | No. 205 WDA 2017 |

Appeal from the Order Entered December 29, 2016
In the Court of Common Pleas of Fayette County
Orphans' Court at No(s): 26 Adopt 2016

BEFORE:  BENDER, P.J.E., BOWES AND STRASSBURGER,* JJ.

MEMORANDUM BY BOWES, J.:                    **FILED AUGUST 7, 2017**

K.A.I. ("Mother") appeals from the order granting the private petition filed by J.D. ("Father") for the termination of her parental rights to her son D.K.I.  We affirm.

During January 2011, D.K.I. was born of the brief relationship between Mother and Father.  The family never resided together, and Mother gave birth to D.K.I.'s half-brother approximately one year later.  Father did not have any contact with D.K.I. for approximately two years after his son's birth until his paternity was confirmed by a DNA test issued concomitant to Mother's child support claim.  Father married his current wife, S.D., during December 2014 and they have two sons born in June 2015 and March 2016, respectfully.  Between 2013 and 2015, Father exercised weekend custody of

_____
* Retired Senior Judge assigned to the Superior Court.

D.K.I. pursuant to an informal agreement. In April 2015, Mother asked Father to maintain temporary custody of D.K.I. while she recovered from her father's suicide. Mother has not had physical contact with her son since that date, and her most recent conversation with him occurred during the summer of 2015.

After coming to Mother's assistance and assuming temporary custody of D.K.I., Father filed a custody complaint seeking sole physical custody, and the matter proceeded to mediation. Father challenged the results of that proceeding on the ground that "the [m]ediator was being a little biased because she was also female." N.T., 7/14/16, at 31. Father's protest was successful. The custody court assigned a new mediator and scheduled a second mediation. Mother was not represented during the mediation and she alleges that the replacement mediator chastised her for associating with black men and potentially having a bi-racial baby. *Id*. at 15-16. Father paid for a court-administered urine screen and demanded that Mother comply with it before exercising physical custody. The mediator agreed, and Father was awarded temporary physical custody pending Mother's compliance and further proceedings. As Mother failed to submit to the drug test or advance the custody litigation, that 2015 order effectively awarded Father sole physical custody of D.K.I. without a trial to determine the child's best interest pursuant to the Child Custody Law, 23 Pa.C.S. § 5328(a).

On May 11, 2016, Father filed a petition for the involuntary termination of Mother's parental rights to D.K.I. Invoking the statutory grounds outlined in 23 Pa.C.S. § 2511(a)(1), Father asserted that, for the six months preceding the filing of the petition, Mother either evinced a settled purpose to relinquish her parental rights or failed to perform parental duties. The orphans' court appointed attorneys to represent D.K.I. and Mother, respectively, and scheduled an evidentiary hearing. Father testified in support of his position, identified his wife, S.D., as the individual with present intention to adopt D.K.I., and called Mother as a witness as if on cross-examination. In addition to outlining the statutory grounds for terminating Mother's parental rights, Father testified that D.K.I. shared familial bonds with S.D., who had assumed Mother's role as maternal caregiver, and his two paternal half-brothers. Mother countered with testimony outlining her efforts to contact D.K.I. while he was in Father's custody and presented the testimony of her mother ("Maternal Grandmother") and cousin, A.K. On December 29, 2016, the orphans' court granted Father's petition and terminated Mother's parental rights. This timely appeal followed.

Mother complied with Pa.R.A.P. 1925(a)(2)(i) by filing a statement of errors complained of on appeal concurrent with her notice of appeal. Mother's Rule 1925(b) statement raised seven issues which she reiterated on appeal as follows:

1. Whether the Trial Court erred in finding that the Appellee, J.D., Natural Father of D.K.I., met his burden by clear and convincing evidence with regard to 23 Pa.C.S.A. 2511 sufficient to support termination of Mother's parental rights?

2. Whether the Trial Court erred in failing to consider the attempts that Mother had made in attempting to contact D.K.I., within the six months immediately preceding the filing of the Petition for Involuntary Termination?

3. Whether the Trial Court erred failing to consider the post termination consequences in that D.K.I., had a half sibling that he was raised with up until his separation from him by Father?

4. Whether the Trial Court erred in failing to look at the reasonable attempts by Mother to overcome obstacles created by the party seeking to terminate her parental rights?

5. Whether the Trial Court erred in considering the personal obstacles that Mother has overcome in the six months immediately preceding the filing of the termination petition?

6. Whether the Trial Court erred in failing to consider Father's attempts to thwart the relationship Mother had with D.K.I.?

7. Whether the Trial Court erred in finding that the termination of the child would be in the minor child's best interest, considering all of the relevant factors?

Mother's brief at 4. Father and D.K.I.'s appointed counsel both submitted briefs supporting the orphans' court's order terminating Mother's parental rights.

Mother discusses issues one, two, four, five, and six collectively. Accordingly, we address those claims together. The crux of Mother's aggregate complaint is that Father did not prove the statutory grounds to terminate her parental rights.

Our standard of review is well settled.

The standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. The trial court's decision, however, should not be reversed merely because the record would support a different result. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (citations and quotation marks omitted).

As the party petitioning for the termination of Mother's parental rights, Father "must prove the statutory criteria for that termination by at least clear and convincing evidence." *In re T.R.,* 465 A.2d 642, 644 (Pa. 1983). Clear and convincing evidence is defined as "testimony that is so clear, direct, weighty, and convincing as to enable the trier of fact to come to a clear conviction, without hesitancy, of the truth of the precise facts in issue." *Matter of Sylvester,* 555 A.2d 1202, 1203–04 (Pa. 1989).

Termination of parental rights is governed by 23 Pa.C.S. § 2511, which provides in pertinent part as follows:

**(a) General rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

(1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.

. . . .

**(b) Other considerations.--**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S. § 2511.

With respect to § 2511(a)(1), this Court has explained,

A court may terminate parental rights under Section 2511(a)(1) where the parent demonstrates a settled purpose to relinquish parental claim to a child or fails to perform parental duties for at least the six months prior to the filing of the termination petition. The court should consider the entire background of the case[.]

*In re A.S.*, 11 A.3d 473, 482 (Pa.Super. 2010) (citations omitted). While the statute targets the six months immediately preceding the filing of the petition to terminate, the trial court must consider the entire history of the case and not apply the six-month statutory period mechanically. *In re K.Z.S.*, 946 A.2d 753, 758 (Pa.Super. 2008).

Accordingly, in order to prevail, Father was required to produce clear and convincing evidence of Mother's conduct that fulfills either one of the two requirements outlined in § 2511(a)(1). He did not have to establish both. **In re D.J.S.**, 737 A.2d 283, 285 (Pa.Super. 1999) ("parental rights may be terminated pursuant to Section 2511(a)(1) if the parent either demonstrates a settled purpose of relinquishing parental claim to a child or fails to perform parental duties.") Our Supreme Court has noted that parental duty under § 2511(a)(1) includes "an affirmative duty to love, protect and support" the child and "to make an effort to maintain communication with that child." **In re Adoption of S.P.,** 47 A.3d 817, 828 (Pa. 2012). For example if the parent's fulfillment of those duties is made more difficult by impediments, "we must inquire whether the parent has utilized those resources at his or her command . . . in continuing a close relationship with the child." **Id**.

Once the evidence establishes a failure to perform parental duties or a settled purpose of relinquishing parental rights, the court must then engage in three additional lines of inquiry: (1) the parent's explanation for his or her conduct; (2) the post-abandonment contact between parent and child; and (3) consideration of the effect of termination of parental rights on the child pursuant to Section 2511(b). **In re Z.S.W.**, 946 A.2d 726, 730 (Pa.Super. 2008).

Instantly, the orphans' court determined that Father satisfied his statutory burden. The court concluded,

> [b]ased on the evidence presented, the Court finds that during the six month period in question, Mother never visited D.K.I., sent him a card or letter, spoke with him on the telephone or via Skype/FaceTime, or acknowledged his birthday or other common gift-giving holidays and occasions. Mother's justification was alleged "road blocks" created by Father, even though his address and phone number had not changed since the last custody mediation between the parties.

Trial Court Opinion, 12/29/16, at 5.

The record supports the orphans' court's conclusion that Mother failed to perform her parental duties for more than the six months preceding the date Father filed the petition to terminate parental rights. Mother alleges that Father capitalized upon her drug addiction, homelessness, and unemployment to erect barriers that impaired her ability to contact D.K.I. She argues that Father ignored her telephone calls and text messages and blocked her on social media. She also contends that Father rebuffed the efforts of family members whom she enlisted to contact D.K.I. on her behalf. Unfortunately for Mother, the certified record does not sustain either the claim that her failure to perform parental duties was solely the product of Father's obstructionism or that she exercised reasonable efforts to overcome the obstacles that Father did erect.

During the evidentiary hearing, Mother outlined her efforts to maintain contact with D.K.I. since July 2015. She testified that, following the second

mediation during spring 2015, Father attempted to prevent her from contacting their son by informing her that it was not included in the mediation order granting him sole custody. N.T., 7/14/16, at 8. After rectifying that misinformation, Mother attempted to call Father once or twice per week to speak with D.K.I., but she eventually gave up during July or August of that year because Father refused to answer the telephone or return her calls. *Id*. at 8-9, 61-62. Only once during that summer did Father permit a brief telephone conversation with their son. *Id*. at 8-9.

However, Mother eventually yielded to Father's impediments, and she never spoke with the child again. Mother testified that she attempted to send Father text messages over a three-day period during October of 2015, but she did not pursue her custody rights at that time due to her poor financial condition. *Id*. at 9, 57. While Mother stated that she lost Father's telephone number between August and October 2015, she neglected to proffer any supporting evidence or produce telephone records to confirm any of her purported attempts to reestablish contact. *Id*. at 10. Likewise, Mother failed to obtain Father's address in order to mail her son correspondence or gifts. *Id*. at 11-12. Again, Mother claimed that she did not know Father's address and did not recall exchanging contact information with Father; however, she conceded that both parties disclosed their addresses as part of the mediation and that she had no reason to believe that Father had moved since the onset of the custody litigation. *Id*. at 12.

Moreover, when Mother discovered Father's address several months later, she avoided the home because she was afraid of confronting Father due to his anger issues and their stormy relationship. She explained, "I was too afraid [of getting] harassment charges. So if something like [that] did happen, I would definitely have lost my son." *Id*. at 65.

Mother also proffered various justifications for her failure to evade Father's alleged roadblocks. For example, Mother testified that she did not comply with the drug test that the mediator ordered because she lacked transportation to the testing site in Uniontown, Pennsylvania. *Id*. at 14-15. However, that excuse fails because Mother subsequently conceded that she started drug counseling in Uniontown during May 2015, and that although she travelled to Uniontown for counseling at least once per month between November 2015 and May 2016, she never obtained the drug test. *Id*. at 73.

Similarly, Mother indicated that she avoided the custody mediation office due to her lack of legal representation, unfamiliarity with the legal system, and the intimidation by the replacement mediator's alleged derogatory remarks about her interracial relationship. *Id*. at 69. During the evidentiary hearing, Mother expounded, "After [the mediator's] racial comment, I was completely done with the case. I told her I would come back when I had an attorney." *Id*. at 16. She also indicated her hesitation to contact Father without an attorney for fear of legal retaliation. *Id*. at 79.

As it relates to her lack of representation, Mother testified that she did not have the resources to litigate a custody dispute. Likewise, she stated that her friends and family did not possess the financial wherewithal to assist her in retaining counsel for the custody litigation. *Id*. at 81. Mother explained that she contacted a legal aid service during the summer of 2015, but was informed that there was a one-year waiting list. *Id*. at 79. After she followed up with the agency during February or March of 2016, it placed her on a shorter waiting list and conducted an intake interview. *Id*. at 79-80. Later, during May 2016, Mother contacted four attorneys looking for legal assistance but was unable to retain one. *Id*. at 57-58.

In sum, Mother stated that she intended to fight for D.K.I. once she got her affairs in order, which she believes she finally attained during spring 2016. *Id*. at 63. She expounded that it took her over one year from the date she placed D.K.I. in Father's care to attain the stability and financial capacity to retain an attorney and reengage the custody litigation. *Id*. at 58. Mother stresses that she was D.K.I.'s sole provider for the first two-and-one-half years of the child's life, while Father disputed paternity. Noting that she did not seek to terminate Father's parental rights during his extended absence, she argues that the orphans' court erred in failing to provide her a similar opportunity to reconnect with D.K.I. We disagree.

This case began as a contentious custody dispute. We are confident that, had Mother demonstrated any meaningful effort to reunite with her son

- 11 -

between April 2015 and March 2016, there would have been no basis to terminate her parental rights. However, rather than exercising reasonable diligence to overcome any obstacles that Father unquestionably placed in her path, Mother elected to wait for Father to change his mind. Her placid inaction did a great disservice to her son and transformed what was a one-sided custody dispute into a successful claim of parental abandonment pursuant to § 2511(a)(1). Mother took no action to modify the custody arrangement, and while she proffered myriad excuses for her failure to act during the relevant period, there is no evidence of any affirmative efforts to overcome any obstacles that Father erected. We recognize that, after May 2016, Mother took steps to address her drug addiction, homelessness, and instability; however, those efforts were too late. *See* ("With respect to any petition filed pursuant to subsection (a)(1) . . . the court shall not consider any efforts by the parent . . . which are first initiated subsequent to the giving of notice of the filing of the petition"); *In re B.,N.M.*, 856 A.2d 847, 855 (Pa.Super. 2004) ("Parental rights are not preserved by waiting for a more suitable or convenient time to perform one's parental responsibilities while others provide the child with his or her physical and emotional needs."); *In re Adoption of M.E.P.*, 825 A.2d 1266, 1276 (Pa.Super. 2003) ("A child's life simply cannot be put on hold in the hope that the parent will summon the ability to handle the responsibilities of parenting."). As the record supports the orphans' court's finding that Mother failed to perform

parental duties for the six months preceding the petition, we cannot disturb it.

Mother's remaining issues relate to the orphans' court's § 2511(b) analysis. With respect to § 2511(b), this Court has explained the requisite analysis as follows:

> Subsection 2511(b) focuses on whether termination of parental rights would best serve the developmental, physical, and emotional needs and welfare of the child. In *In re C.M.S.*, 884 A.2d 1284, 1287 (Pa.Super. 2005), this Court stated, "Intangibles such as love, comfort, security, and stability are involved in the inquiry into the needs and welfare of the child." In addition, we instructed that the trial court must also discern the nature and status of the parent-child bond, with utmost attention to the effect on the child of permanently severing that bond. *Id*. However, in cases where there is no evidence of a bond between a parent and child, it is reasonable to infer that no bond exists. *In re K.Z.S.*, 946 A.2d 753, 762-63 (Pa.Super. 2008). Accordingly, the extent of the bond-effect analysis necessarily depends on the circumstances of the particular case. *Id*. at 63.

*In re Adoption of J.M.*, 991 A.2d 321, 324 (Pa.Super. 2010). Neither the Adoption Act nor authoritative precedent requires the orphans' court to enlist a formal bonding evaluation, and the court's needs and welfare analysis need not hinge upon expert testimony. *In re Z.P.*, 994 A.2d 1108, 1121 (Pa.Super. 2011).

Instantly, the orphans' court's needs-and-welfare analysis provided as follows:

> D.K.I. has had no contact with Mother since April 2015; the most recent one–fifth of his lifetime. During that four to five-year-old stage, children are typically gaining more of an understanding of

- 13 -

> their surroundings and building significant, lasting relationships with those around them.
>
> Since April 2015, D.K.I. has been with Father and Stepmother on a constant basis. Stepmother is a stay-at-home parent who has continuously cared for D.K.I. and fulfilled the maternal role in Mother's absence. While it is clear that Mother once had a bond with D.K.I., the Court cannot find that any bond remains. Mother has not shown D.K.I. any love, comfort, or support for more than one year; however, Stepmother has. If D.K.I. were to be reunited with Mother, it could adversely affect his developmental and emotional needs. For these reasons, the Court finds that termination is in the best interests of D.K.I.

Trial Court Opinion, 12/29/16, at 6.

Mother does not challenge the orphans' court's finding that the bond that had existed between her and D.K.I. diminished over the year-long period that she has been absent from the five–year-old's life. Similarly, Mother does not assail the orphans' court's conclusion that permanently severing any remaining bond between Mother and D.K.I. would not be detrimental to the child. Rather than contest either of those aspects of the orphans' court's needs-and-welfare analysis, Mother argues that the orphans' court erred in failing to consider the effect of severing the bond between D.K.I. and his maternal half-bother. No relief is due.

Although Mother highlights that both parties testified about the bond between D.K.I. and his maternal half-brother, she ignores Father's evidence that the siblings' relationship was reduced by the passage of time and that D.K.I. forged strong bonds with his two paternal half-brothers in its place. The orphans' court properly considered those existing relationships, as well

- 14 -

as the noted parent-child bond between D.K.I. and his pre-adoptive stepmother, and the importance of continuing those relationships. ***See Adoption of C.J.P.***, 114 A.3d 1046, 1054 (Pa.Super. 2015) ("In addition to a bond examination, the trial court . . . should also consider the intangibles, such as the love, comfort, security, and stability the child might have with the foster parent [and] the importance of continuity of [those] relationships[.]").

As the record sustains the orphans' court's conclusion that terminating Mother's parental rights would best serve D.K.I.'s developmental, physical, and emotional needs and welfare, we will not disturb it.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 8/7/2017