J-S14016-20

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: N.L., A MINOR | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| | : | |
| APPEAL OF: A.L., MOTHER | : | No. 3252 EDA 2019 |

Appeal from the Order Entered October 17, 2019
In the Court of Common Pleas of Philadelphia County
Juvenile Division at No(s):  CP-51-DP-0000985-2018

| | | |
|---|---|---|
| IN THE INTEREST OF: N.C.L., A MINOR | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: A.L., MOTHER | : | No. 3253 EDA 2019 |

Appeal from the Order Entered October 17, 2019
In the Court of Common Pleas of Philadelphia County
Juvenile Division at No(s):  CP-51-AP-0000438-2019

| | | |
|---|---|---|
| IN THE INTEREST OF: N.D.S., A MINOR | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: A.L., MOTHER | : | No. 3254 EDA 2019 |

Appeal from the Order Entered October 17, 2019
In the Court of Common Pleas of Philadelphia County
Juvenile Division at No(s):  CP-51-AP-0000431-2019

| | | |
|---|---|---|
| IN THE INTEREST OF: N.S., A MINOR | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: A.L., MOTHER | : | No. 3255 EDA 2019 |

Appeal from the Order Entered October 17, 2019
In the Court of Common Pleas of Philadelphia County
Juvenile Division at No(s): CP-51-DP-0001014-2018

BEFORE: BOWES, J., KING, J., and FORD ELLIOTT, P.J.E.

MEMORANDUM BY KING, J.:                    **FILED MARCH 30, 2020**

Appellant, A.L. ("Mother"), appeals from the orders entered in the Philadelphia County Court of Common Pleas, which granted the petitions of the Philadelphia Department of Human Services ("DHS") for involuntary termination of Mother's parental rights to her minor children, N.C.L. and N.D.S. ("Children"), and changed Children's permanency goal to adoption.[1] We affirm.

In its opinion, the trial court fully and correctly set forth the relevant facts and procedural history of this case. Therefore, we have no reason to restate them. Procedurally, we add that DHS filed petitions on June 10, 2019, and June 12, 2019, to involuntarily terminate Mother's parental rights to Children, and to change Children's permanency goal to adoption.[2] Following a hearing on October 17, 2019, the court granted DHS' petitions and issued orders terminating Mother's parental rights to each Child, as well as orders

---

[1] The initials "N.L." and "N.C.L." listed in the caption refer to the same child, and the initials "N.S." and "N.D.S." listed in the caption refer to the same child.

[2] Separate guardian *ad litem* ("GAL") and legal counsel represented Children during the termination/goal change proceedings.

changing each Child's permanency goal to adoption. Mother timely filed notices of appeal as to each order, as well as contemporaneous statements of errors complained of on appeal per Pa.R.A.P. 1925.[3] This Court consolidated Mother's appeals *sua sponte* on December 26, 2019.

Mother raises the following issues for our review:

> WHETHER THE TRIAL COURT'S DECISION TO INVOLUNTARILY TERMINATE [MOTHER]'S PARENTAL RIGHTS TO HER CHILDREN N.C.L. AND N.D.S., WAS NOT SUPPORTED BY CLEAR AND CONVINCING EVIDENCE WARRANTING SUCH DETERMINATION?
>
> WHETHER THE TRIAL COURT'S DECISION TO CHANGE…CHILDREN'S PERMANENCY GOAL FROM REUNIFICATION WITH THE PARENT TO ADOPTION WAS NOT SUPPORTED BY CLEAR AND CONVINCING EVIDENCE DEMONSTRATING THAT SUCH DECISION WOULD BEST PROTECT…CHILDREN'S NEEDS AND WELFARE AND BE IN…CHILD[REN]'S BEST INTERESTS?

(Mother's Brief at 5).

On appeal, goal change decisions are subject to an abuse of discretion standard of review. *In re N.C.,* 909 A.2d 818, 822 (Pa.Super. 2006).

> In order to conclude that the trial court abused its discretion, we must determine that the court's judgment was "manifestly unreasonable," that the court did not apply the law, or that the court's action was "a result of partiality, prejudice, bias or ill will," as shown by the record. We are bound by the trial court's findings of fact that have support in the record. The trial court, not the appellate court, is charged with the responsibilities of evaluating credibility of the

---

[3] T.E.S. is the natural father of N.C.L., and D.K.S. is the natural father of N.D.S. On October 17, 2019, the court also terminated T.E.S.' and D.K.S.' parental rights to their respective children. Neither father has appealed.

> witnesses and resolving any conflicts in the testimony. In carrying out these responsibilities, the trial court is free to believe all, part, or none of the evidence. When the trial court's findings are supported by competent evidence of record, we will affirm, "even if the record could also support an opposite result."

*Id.* at 822-23 (internal citations omitted).

After a thorough review of the record, the briefs of the parties, the applicable law, and the well-reasoned opinion of the Honorable Allan L. Tereshko, we conclude Mother's issues merit no relief. The trial court opinion comprehensively discusses and properly disposes of the questions presented. (*See* Trial Court Opinion, dated December 12, 2019, at 11-20) (finding: **(1)** Children have been in placement since April 2018; at termination hearing, Ms. Taylor, case manager since July 2018, credibly testified that Children came into DHS' care due to N.C.L's truancy and Department of Licenses and Inspections' report of uninhabitable condition of Mother's home; Mother failed to comply with Single Case Plan ("SCP") objectives to undergo drug testing throughout life of case; Mother attended drug testing only once; Mother also failed to show proof of compliance with SCP objectives to obtain employment and secure housing; Mother failed to regularly attend supervised visits and was removed from visitation schedule for noncompliance; during Children's home visit in October 2018, N.C.L. had to use his birthday money to buy food, because there was no food or pots and pans in Mother's home; Children have been in same foster home with same foster mother; Ms. Taylor noted Children have strong bond with foster mother, who fulfills Children's needs, while

Children lack strong bond with Mother; Ms. Taylor opined Children would not suffer irreparable harm if Mother's parental rights to Children were terminated; Mother failed in her duty to make diligent efforts and actively participate in services that would help her assume her parental responsibilities; Mother remained without housing, claimed to have been sober for only two weeks, and failed to provide documentation of employment; Mother made no progress in remedying conditions that brought Children into care and is unable to provide Children proper parental care and control; **(2)** DHS made reasonable efforts to give Mother opportunity for reunification with Children; Mother, however, did not use referrals and resources DHS provided her; Mother failed to appear for drug testing, obtain housing, provide documentation of employment, and appear for supervised visits with Children; evidence established change in Children's permanency goal to adoption was disposition best suited to Children's safety, protection, and physical, mental, and moral welfare).  Accordingly, we affirm based on the trial court's opinion.

Orders affirmed.


*Judgment Entered.*

*Joseph D. Seletyn, Esq.*
*Prothonotary*


*Date: 3/30/2020*

- 5 -

**THE FIRST JUDICIAL DISTRICT OF PENNSYLVANIA, PHILADELPHIA COUNTY**
**IN THE COURT OF COMMON PLEAS**

| | |
|---|---|
| IN THE INTEREST OF | : FAMILY COURT DIVISION |
| | : JUVENILE BRANCH-DEPENDENCY |
| | : |
| N.C.L., a Minor | : CP-51-AP-0000438-2019/CP-51-DP-0000985-2018 |
| | : |
| N.D.S., a Minor | : CP-51-AP-0000431-2019/CP-51-DP-0001014-2018 |
| | : |
| | : Superior Court: |
| | : 3252 EDA 2019; 3253 EDA 2019; |
| | : 3254 EDA 2019; 3255 EDA 2019 |
| APPEAL OF: | |
| A.L., Mother | |

## OPINION

A.L. ("Mother"), appeals from the Decrees and Orders entered by this Court on October 17, 2019, granting the Petitions to Involuntarily Terminate her Parental Rights and Change the Permanency Goal to Adoption for two Children: N.C.L., a male, born on September      2008, and N.D.S, a male, born on May      2015, filed by the Department of Human Services ("DHS"), on June 10, 2019, and June 12, 2019, and served on all parties.

In response to the Decrees of Involuntary Termination of Parental Rights and Goal Change Orders issued on October 17, 2019, Mother, by and through her counsel, filed Appeals and filed Notices of Appeal with Statements of Matters Complained of Upon Appeal on November 15, 2019.

Both Fathers', T.E.S. and D.K.S., parental rights were terminated, neither appealed.

1

## STATEMENT OF MATTERS COMPLAINED OF ON APPEAL

In her Statement of Matters Complained of on Appeal, Mother states that the Trial Court erred in the following respects:

1. The trial court's decision to involuntarily terminate Mother's parental rights to her children was not established by clear and convincing evidence supporting such termination.
2. The trial court's decision to change the children's permanency goal from reunification with the parent to adoption was not established by clear and convincing evidence supporting that such decision would best protect the children's needs and welfare and be in the children's best interests.

## PROCEDURAL HISTORY:

A.L. (hereinafter "Mother") is the Mother of N.C.L. and N.D.S. (Exhibit "B" Certifications of Birth, attached to DHS Petitions for Involuntary Termination of Parental Rights, filed 6/10/2019 and 6/12/2019).

T.E.S. (hereinafter "Father") is the father of N.C.L., however, he is not listed on the birth certificate of the child. (Exhibit "B" Certification of Birth, attached to DHS Petition for Involuntary Termination of Parental Rights, filed 6/12/2019).

D.K.S. (hereinafter "Father") is the father of N.D.S., and is listed as the father on the Certification of Birth. (Exhibit "B" Certification of Birth, attached to DHS Petition for Involuntary Termination of Parental Rights, filed 6/10/2019).

On March 19, 2018, the Department of Human Services (DHS) received a General Protective Services (GPS) Report alleging that on March 15, 2018, nine-year-old N.C.L. was in Regional Truancy Court before Juvenile Court Hearing Officer George Twardy pursuant to a Truancy Petition filed for him because of excessive absences; that

2

for the 2017-2018 school year, he had 11 unexcused absences; that for the 2016-2017 school year, he had 24 unexcused absences; and that since the last court date, he had two unexcused absences. The Report alleged that Hearing Officer Twardy ordered N.C.L., to attend school daily with no lateness's, cuts, or suspensions; that absences may only be excused with a physician's note; that truancy services through Jewish Family and Children's Service (JFCS) stand; and that DHS file a Dependent Petition. Per the truancy case worker, N.C.L.'s Mother, A.L., stated that the truancy records for the child were erroneous; that he was being bullied at school and suffered from seizures; and that Mother admitted keeping him home from school when the school did not report an incident that had occurred at school because the incident later caused the child to have a seizure. This Report was determined to be valid. (Exhibit "A" Statement of Facts, attached to DHS Petitions for Involuntary Termination of Parental Rights, filed 6/10/2019 & 6/12/2019, ¶ "a").

On March 22, 2018, DHS went to the family's home to investigate the Report. DHS found that the home was in deplorable condition and that the Philadelphia Department of Licenses and Inspections (L&I) declared the home uninhabitable. L&I informed Mother that she needed to vacate the home by March 24, 2018. (Exhibit "A" Statement of Facts, attached to DHS Petitions for Involuntary Termination of Parental Rights, filed 6/10/2019 & 6/12/2019, ¶ "b").

On March 23, 2018, Mother, N.C.L., and his younger sibling, N.D.S., began residing at Stenton Family Manor Shelter. A Safety Plan was implemented. (Exhibit "A" Statement of Facts, attached to DHS Petitions for Involuntary Termination of Parental Rights, filed 6/10/2019 & 6/12/2019, ¶ "c").

3

On April 8, 2018, DHS learned that Mother moved her family out of the shelter without notice, violating the Safety Plan, and returned to the home of origin. (Exhibit "A" Statement of Facts, attached to DHS Petitions for Involuntary Termination of Parental Rights, filed 6/10/2019 & 6/12/2019, ¶ "d").

On April 23, 2018, DHS located Mother and her two children at the home of origin. DHS obtained an Order of Protective Custody (OPC) for N.C.L. and N.D.S. and placed them in Foster Care through Pradera Corporation. (Exhibit "A" Statement of Facts, attached to DHS Petition for Involuntary Termination of Parental Rights, filed 6/10/2019 & 6/12/2019, ¶ "e").

On April 25, 2018, a Shelter Care Hearing was held before the Honorable Joseph Fernandez. The OPC was lifted and legal custody of the Children transferred to DHS, and placement in Foster Care through Pradera. N.D.S.'s Father, D.S., address is 1737 N. 23rd St., Philadelphia, PA 19121. CUA to explore all relatives and friends. Forthwith medical and dental for children, and a clothing voucher. (Shelter Care Orders, 4/25/2018).

T.S., N.C.L.'s Father, is incarcerated at State Correctional Institutional (SCI) Chester. He is currently serving a four to ten-year sentence for his guilty plea to charges of possession of a firearm and robbery-inflicting bodily injury. (Exhibit "A" Statement of Facts, attached to DHS Petition for Involuntary Termination of Parental Rights, filed 6/10/2019 & 6/12/2019, ¶ "g").

On May 2, 2018, CUA held an initial Single Case Plan (SCP) Meeting. The goal identified for the Children was "Return to Parent". The parental objectives established for Mother were to: 1) comply and cooperate with CUA services, 2) sign all necessary release forms, 3) attend all of the children's medical and dental appointments, and follow

4

all recommendations, 4) comply with supervised visitation with the Children at any agreed location, 5) attend and participate in the ARC program for parenting and housing, 6) secure suitable housing with operable utilities, 7) continue to maintain contact with her caseworker, 8) continue to maintain employment, and 9) provide CUA with family members for possible kinship placement. Mother participated in the SCP Meeting. Both Fathers failed to participate in the SCP Meeting. (Exhibit "A" Statement of Facts, attached to DHS Petition for Involuntary Termination of Parental Rights, filed 6/10/2019 & 6/12/2019, ¶ "h").

On May 3, 2018, Adjudicatory Hearings were held before the Honorable Allan L. Tereshko. Legal custody of the Children transferred to DHS and placement in Foster Care through Tabor. N.C.L., had 15 unexcused absences this school year. Truancy discharged. Mother to have weekly supervised visits at the Agency. Visitation may be modified before the next court date. CUA to explore Maternal Aunt as a possible placement resource. Mother and Father, D.K.S., are referred to Achieving Reunification Center (ARC) for housing. Children safe as of 5/01/2018. (Orders of Adjudication, 5/03/2018).

On November 1, 2018, Permanency Review Hearings were held for both Children before the Honorable Allan L. Tereshko. Legal custody remains with DHS, and placement continues in Foster Care through Pradera. Mother referred to the Clinical Evaluation Unit (CEU) for a forthwith drug and alcohol screen and two random drug and alcohol screens prior to the next court hearing. Mother to have supervised visitation at the Agency. Mother referred to CEU for a forthwith screen, two random drug screens prior to the next court date. (Permanency Review Order, 11/01/2018).

5

On February 1, 2019, Permanency Review Hearings were held for both Children before the Juvenile Court Hearing Officer, Michael G. Campbell. Legal custody remains with DHS, and placement continues in Foster Care through Pradera. N.C.L., is in the 4th grade and has perfect attendance. He is up to date with medical and dental. N.D.S., is also up to date with medical and dental. Mother has not been compliant with the permanency plan. Mother referred to the CEU for an assessment and evaluation prior to the next court hearing. Mother referred to ARC, and to provide proof of housing and employment. (Recommendation—Permanency Review Orders, 2/01/2019).

On April 17, 2019, CUA held a revised SCP Meeting. The goal identified for the Children was as "Return to Parent". The parental objectives established for Mother were to: 1) comply and cooperate with CUA services, 2) sign all necessary release forms, 3) attend all the Children's medical and dental appointments, and follow all recommendations, 4) comply with supervised visitation with the Children at any agreed location, 5) attend and participate in the ARC program for parenting and housing, 6) secure suitable housing with operable utilities, 7) continue to maintain contact with her caseworker, 8) continue to maintain employment, and 9) provide CUA with family members for possible kinship placement. Mother failed to participate in the SCP Meeting. (Exhibit "A" Statement of Facts, attached to DHS Petition for Involuntary Termination of Parental Rights, filed 6/10/2019 & 6/12/2019, ¶ "l").

On April 18, 2019, Permanency Review Hearings were held for both Children before the Honorable Allan L. Tereshko. Legal custody remained with DHS, and placement continued in Foster Care through Pradera. Mother shall have weekly supervised visitation at the Agency and to confirm 24 hours in advance. Children are up

6

do date with medical. Mother referred to the CEU for an assessment and three random drug and alcohol screens prior to the next hearing. Mother to provide proof of employment to CUA. Mother to engage with ARC for appropriate services. Mother court ordered to stay away from N.D.S.'s school. Mother did not attend hearing. (Permanency Review Orders, 4/18/2019).

## TERMINATION HEARING of October 17, 2019

Angela Taylor, CUA Case Manager, Tabor Community Partners testified the children came into care because of a Truancy Petition and a Licensing & Inspection Report of uninhabitable housing in April 2018. She began managing the case in July 2018 and stated one of Mother's Single Case Plan objectives was attendance at the CEU for drug testing, which Mother attended only once on 9/11/2019 and she did not have the results. Mother has not reported any drug treatment. Another objective for Mother was employment, and Mother has not reported any proof of employment. Regarding housing, another objective, Mother reported to her she is living with a friend, however, did not provide proof of residence. Regarding visitation, Mother was court ordered biweekly supervised visits with the Children on Mondays. Mother missed four visits and she was removed from the schedule for noncompliance. Mother has not come in to meet with her and the visitation team supervisor to reschedule the visits. Ms. Taylor testified last time Mother visited the Children was May of 2019. (N. T., 10/17/2019, p. 5 at 18-25; pp. 6-8 at 1-25; p. 9 at 1-9).

Ms. Taylor testified N.C.L., is now 11 years old, and he was placed in Foster Care through Pradera in a Pre-Adoptive home in April 2018. She has observed the interaction between the Child and his Foster Parent. She believes a strong bond exists between them

7

as he looks to her as he would a Grandmother. He receives home cooked meals, is taken to school and receives help with homework from his Foster Mother. She also takes him to his medical and dental appointments, and the Child is well taken care of. She last saw him at the home on 10/09/2019, and observed that the Child is safe, and his needs are being met. She opines that the Child lacks a parent-child relationship with his Mother and believes the Child would not suffer irreparable harm if Mother's parental rights were terminated. She further opined that it would be in N.C.L.'s best interest to be adopted by his Foster Parent. (N. T., 10/17/2019, p.14 at 1-25; p.15 at 10-25; p.16 at 1-25; p.17 at 1-3).

On cross-examination by GAL, Jeffrey Bruch, Esq., Ms. Taylor testified the Child is placed with his sibling, N.D.S., in the same Foster Home. She noted that when she started managing the case, Mother had two visits with the Children back in September and December 2018, because it was N.C.L.'s birthday. She stated Mother's visits were appropriate. (N. T., 10/17/2019, p.17 at 8-21).

Lawrence O'Connor, Esq., TPR counsel for the Children, testified he met with N.C.L., and that the Child has a certain amount of conflict. The 11-year-old Child understands quite well the situation and the reason why he is not living with his Mother right now. He did indicate he wishes he could be reunified with his Mother, only, "if she got it together." But he also indicated that, if this process plays out and Mother's rights are terminated, he wishes to be adopted by his current caregiver. He did seem to understand the adoption process and legal ramifications. He kept going back to whether he would still see his Mother if the adoption went through. Mr. O'Conner stated he assured him that was always a possibility. His caregiver also assured him she would

8

make sure that he always maintained a relationship and visitation with his Mother. The child understands why reunification with his Mother has not happened, and may not happen, and that he is extremely happy in the home and feels cared for and loved by his Foster Mother, and he would be happy to be adopted by her if that's how things play out. (N. T., 10/17/2019, p.30 at 10-25; p.31 at 1-15).

Ms. Taylor testified regarding the younger Child, N.D.S. She stated the same circumstances existed as to why this Child came to care. She noted the FSP objectives for Mother were the same and Mother failed to comply with the objectives. She noted an incident that occurred with N.D.S., when they both visited Mother in September 2018, when the Child had urinated on himself and became afraid and asked Mother if she was going to "pop him" because of soiling himself just like his Foster Parent did. Mother called in a Report and the resource parent was investigated and the Agency went over the appropriate disciplinary actions with the Children in the home. The Report was unfounded. (N. T., 10/17/2019, p.35 at 10-25; p.36 at 1-25; p.37 at 1-4).

Ms. Taylor further testified there was another incident that was reported by the older Child, N.C.L., during a home visit she made in October 2018. She noted the Child was upset that he had to use his birthday money that the Foster Parent had given him to buy food for him and his brother while at Mother's house. There was no food, no pots or pans in Mother's house and Mother asked him to use his money to buy food.

Ms. Taylor opined there is a lack of parental bond between this 4 ½ year old Child and his Mother. She believes this Child would not suffer irreparable harm if Mother's rights were terminated because of the same reasons she testified to before, Mother's lack of contact with the Children and lack of compliance with her FSP objectives. She noted

the two boys are in the same pre-adoptive home, where they have lived since April 2018. N.D.S. has a good bond with the Foster Parent and calls her "mom-mom", and the Foster Parent makes sure the Child attends preschool, and he is safe and well taken care of. She further opined that it would be in this Child's best interest to be adopted by the Foster Parent. (N. T., 10/17/2019, p.37 at 8-25; p.38 at 1-16; p.39 at 17-25; p.40 at 1-4; p.42 at 5-25; p.43 at 1-15).

Mr. O'Connor, Esq., TPR counsel for the Children, again testified he met with N.D.S., and that the Child stated unequivocally, without hesitation that he wants to stay with his Foster Parent and wants that to be his forever home. He stated the Child is "4 ½ years-old and did not seem to comprehend the legal concepts of adoption or termination of parental rights, but there was absolutely no hesitation, he came out and said it before I even turned to him and asked the question." (N. T., 10/17/2019, p.50 at 8-17).

Mother was the last witness to testify, and stated she is 29 years old, and lives at 1505 N. 6th St., Philadelphia, PA 19122 with a friend. She stated this friend's home would be an appropriate house to bring her Children to live. She further stated she wants her Children returned to her care and does not want her parental rights terminated. Regarding drug testing, Mother stated she was not told to appear until 10/15/2019, and that she was aware she was required to be drug tested, however she never received paperwork from the Court. Mother claims she has been sober for a couple of weeks and has not used her drug of choice, marijuana, for a few weeks. She also stated her use of marijuana does not affect her capacity to provide care for her Children because it only helps her to sleep. Mother testified she currently works 5 hours per day at the Dollar Tree Store and just started a job as a home health aide at 365 Agency for 11 hours per

10

week. Mother stated she did not visit her Children because she had surgery to remove her tonsils and could not leave her home. Mother stated she cannot communicate with Ms. Taylor or any other person to reschedule her visits. Mother noted that she speaks to her Children on the telephone and that the Foster Parent allows her to see them without supervised visits. She is bonded with both of her Children and they would be harmed if her parental rights were terminated. (N. T., 10/17/2019, pp.51-53 at 1-25; pp. 54-59 at 1-25; p.60 at 1-21; pp.61-62 at 1-25; p.63 at 1-18).

## STANDARD OF REVIEW AND LEGAL ANALYSIS

When reviewing an appeal from a decree terminating parental rights, an appellate Court is limited to determining whether the decision of the trial court is supported by competent evidence. Absent an abuse of discretion, an error of law, or insufficient evidentiary support for the trial court's decision, the decree must stand. Where a trial court has granted a petition to involuntarily terminate parental rights, an appellate court must accord the hearing judge's decision the same deference that it would give to a jury verdict. The Pennsylvania Superior Court need only agree with a trial court's decision as to any one subsection under 23 P.C.S.A. §2511 (a) in order to affirm a termination of parental rights. *In re D.A.T.* 91 A.3d 197(Pa.Super.2014).

The standard of review in termination of parental rights cases requires appellate Courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. We have previously emphasized

11

our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings. In re T.S.M., 620 Pa. 602, 71 A.3d 251, 267 (2013) and quotation marks omitted) In re Adoption of C.D.R., 2015 PA Super 54, 111 A.3d 1212, 1215 (2015).

### The Trial Court Found Clear and Convincing Evidence to Terminate Mother's Parental Rights Pursuant to 23 Pa.C.S.A. §2511(a)(1), (2), (5) and (8) and 2511 (b) [1]

Involuntary termination of parental rights is governed by § 2511 of the Adoption Act, 23 Pa.C.S. §§ 2101-2938. As the party petitioning for termination of parental rights, DHS "must prove the statutory criteria for that termination by at least clear and convincing evidence." *In re T.R.*, 465 A.2d 642, 644 (Pa. 1983). Clear and convincing evidence is defined as "testimony that is so clear, direct, weighty, and convincing as to

---

[1] **23 Pa.C.S.A. §2511 (a) General Rule.—**the rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds: (1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parenting claim to a child or has refused or failed to perform parental duties. (2) The repeated and continued incapacity, abuse. neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent. (5) The child has been removed from the care of the parents by the court or under a voluntary agreement with an agency for a period of at least six months, the conditions which led to the removal or placement of the child continue to exist, the parent cannot or will not remedy those conditions within a reasonable period of time, the services or assistance reasonably available to the parent are not likely to remedy the conditions which led to the removal or placement of the child within reasonable period of time and termination of the parental rights would best serve the needs and welfare of the child. (8) The child has been removed from the care of the parent by the court or under voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of the parental rights would best serve the needs and welfare of the child.

**23 Pa.C.S.A. §2511 (b). Other Considerations.—**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1),(6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

12

enable the trier of fact to come to a clear conviction, without hesitancy, of the truth of the precise facts in issue." *Matter of Sylvester*, 555 A.2d 1202, 1203-04 (Pa.1989).

Termination of parental rights is governed by Section 2511 of the Adoption Act 23 Pa.C.S.A. §§ 2101–2938, which requires a bifurcated analysis. Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond. *In re L.M.*, 923 A.2d 505, 511 (Pa.Super.2007) (citations omitted). In re Adoption of C.J.J.P., 2015 PA Super 80, 114 A.3d 1046, 1049-50 (2015). The Court need only agree with the orphans' court as to any one subsection of Section 2511(a), as well as Section 2511(b), in order to affirm. In re Adoption of C.J.J.P., 2015 PA Super 80, 114 A.3d 1046, 1050 (2015).

Mother alleges that this Trial Court's decision to involuntarily terminate her parental rights to her Children was not established by clear and convincing evidence supporting such termination. This Court disagrees and found that clear and convincing evidence was presented to involuntarily terminate Mother's parental rights.

On March 19, 2018, the Department of Human Services (DHS) received a General Protective Services (GPS) Report alleging that on March 15, 2018, nine-year-old

13

N.C.L., was in Regional Truancy Court before Juvenile Court Hearing Officer George Twardy pursuant to a Truancy Petition filed for him because of excessive absences; that N.C.L. was in the PI grade at William D. Kelley School; that for the 2017-2018 school year, he had 11 unexcused absences; that for the 2016-2017 school year, he had 24 unexcused absences; and that since the last court date, he had two unexcused absences. The Report alleged that Hearing Officer Twardy ordered N.C.L., to attend school daily with no lateness's, cuts, or suspensions; that absences may only be excused with a physician's note; that truancy services through Jewish Family and Children's Service (JFCS) to stand; and that DHS file a Dependent Petition.

On March 22, 2018, DHS went to the family's home to investigate the Report. DHS found that the home was in deplorable condition and that the Philadelphia Department of Licenses and Inspections (L&I) declared the home uninhabitable. L&I informed Mother that she needed to vacate the home by March 24, 2018. On March 23, 2018, Mother, N.C.L., and his younger sibling, N.D.S., began residing at Stenton Family Manor Shelter. A Safety Plan was implemented. On April 8, 2018, DHS learned that Mother moved her family out of the Shelter without notice, violating the Safety Plan, and returned to the home of origin. On April 23, 2018, DHS located Mother and her two Children at the home of origin. DHS obtained an Order of Protective Custody (OPC) for N.C.L. and N.D.S. and placed them in Foster Care through Pradera Corporation.

This Court heard credible, persuasive evidence from Angela Taylor, CUA Case Manager, Tabor Community Partners, regarding the conduct of Mother while the Children have been under court supervision. She testified the Children came into care because of a Truancy Petition and a Licensing & Inspection Report of uninhabitable

14

housing in April 2018. She began managing the case in July 2018 and stated one of Mother's Single Case Plan objectives was attendance at the CEU for drug testing, which Mother attended only once on 9/11/2019 and she did not have the results. Mother has not reported any drug treatment. Another objective for Mother was employment, and Mother has not reported any proof of employment. Regarding housing, another objective, Mother reported to her she is living with a friend, however, did not provide proof of residence. Regarding visitation, Mother was court ordered biweekly supervised visits with the children on Mondays. Mother missed four visits and she was removed from the schedule for noncompliance. Mother has not come in to meet with her and the visitation team supervisor to reschedule the visits. Ms. Taylor testified last time Mother visited the Children was May of 2019. Ms. Taylor further testified there was another incident that was reported by the older Child, N.C.L., during a home visit she made in October 2018. She noted the Child was upset that he had to use his birthday money that the Foster Parent had given him to buy food for him and his brother while at Mother's house. There was no food, no pots or pans in Mother's house and Mother asked him to use his money to buy food.

On cross-examination by Jeffrey Bruch, Esq., GAL, Ms. Taylor testified the Child is placed with his sibling, N.D.S. in the same Foster Home. She noted that when she started managing the case, Mother had two visits with the Children back in September and December 2018, because it was N.C.L.'s birthday. She stated Mother's visits were appropriate.

Ms. Taylor testified that N.C.L., is now 11 years old and has been in the Pre-Adoptive home since April 2018. She has observed the interaction between the Child

15

and his Foster Parent. She believes a strong bond exists between them as he looks to her as he would a Grandmother. He receives home cooked meals, is taken to school and receives help with homework from his Foster Mother. She also takes him to his medical and dental appointments, and the Child is well taken care of. She last saw him at the home on 10/09/2019, and observed that the Child is safe, and his needs are being met. She opines that the Child lacks a parent-child relationship with his Mother and believes the Child would not suffer irreparable harm if Mother's parental rights were terminated. She further opined that it would be in N.C.L.'s best interest to be adopted by his Foster Parent. Ms. Taylor opined there is also a lack of parental bond between N.D.S., this 4 ½ year old child and his Mother. She believes he would not suffer irreparable harm if Mother's rights were terminated because of the same reasons she testified to before, Mother's lack of contact with the Children and lack of compliance with her FSP objectives. She noted the two boys are in the same Pre-Adoptive home, where they have lived since April 2018. N.D.S., has a good bond with the Foster Parent and calls her "mom-mom", and the Foster Parent makes sure the Child attends preschool, and he is safe and well taken care of.

She further opined that she believes these Children would not suffer irreparable harm if Mother's rights were terminated because of Mother's lack of contact with the Children and lack of compliance with her FSP objectives, and it would be in the Children's best interest to be adopted by the Foster Parent.

This Court found that the evidence presented in this case satisfied the statutory criteria for the involuntary termination of Mother's parental rights by testimony that was clear, direct, weighty, and convincing. The evidence illustrates that DHS and the CUA

16

Agency made all efforts to assist Mother in obtaining the services necessary to facilitate reunification with her Children. However, it is imperative that Mother cooperate with the services being offered, in this case, Mother has failed in her affirmative duty to make diligent efforts and actively participate in those services that would help her to assume her parental responsibilities. Mother continues to not have housing, claims to have been off drugs for two weeks, and alleges she has two jobs, however, has not provided documentation. Mother has made no significant progress in remedying the conditions that brought these Children into care and she remains unable to provide proper parental care and control for these Children. This Court notes that when efforts of reunification have failed, the Agency has an obligation to work toward terminating Mother's parental rights to ensure the Children have a safe, stable and healthy environment. The Children are now stable and safe with the pre-adoptive caregiver.

**Trial Court Properly Found that the Goal Change from Return to Parent to Adoption was in the Children's Best Interest and the Court's Disposition was Best Suited to the Safety, Protection and Physical, Mental and Moral Welfare of the Children Pursuant to 42 Pa.C.S.A. §6351 (f.1) (2) and (g).[2]**

In proceedings to change the placement goal for a dependent child from reunification to adoption the focus on the Child's best interest. The concept of a "goal change" is consistent with the statute which requires the trial court, at the conclusion of a permanency hearing in a child dependency proceeding, to order the continuation, modification, or termination of placement or other disposition which is best suited to the

---

[2] **42 Pa.C.S.A. §6351-Disposition of dependent Child.—(f.1).** Additional determinations. Based upon the determinations made under subsection (f) and all relevant evidence presented at the hearing, the court shall determine one of the following: (2) If and when the Child will be placed for adoption, and the county agency will file for termination of parental rights in cases where return to the Child's parent, guardian or custodian is not best suited to the safety, protection and physical, mental and moral welfare of the Child. **(g) Court Order**—ON the basis of the determination made under subsection (f.1), the court shall order the continuation, modification or termination of placement or other disposition which is best suited to the safety, protection and physical, mental and moral welfare of the child.

17

safety, protection and physical, mental, and moral welfare of the child; an order to continue, modify, or terminate the current placement, as required by the statute, is synonymous with a decision to continue or change the permanency plan goal. 42 Pa.C.S.A. § 6351(g)

Mother alleges the Trial Court's decision to change the Children's Permanency Goal from Reunification with the parent to Adoption was not established by clear and convincing evidence supporting that such decision would best protect the Children's needs and welfare and be in the Children's best interests. This Court disagrees.

Competent and persuasive evidence was presented to this Court by the Agency that reasonable efforts were made by the Agency to give Mother the avenue for reunification with her Children, however, Mother failed to use the referrals and resources provided to her by the Agency. Mother failed to appear at CEU for drug testing, failed to obtain housing, failed to provide documentation of employment, failed to provide documentation of employment at the hearing, and failed to appear for supervised visits with her Children.

Based on the clear, convincing and credible evidence presented, this Court concluded that ordering a Permanency Goal Change from "Return to Parent or Guardian" to "Adoption" for these two Children is the disposition which is best suited to the safety, protection and physical, mental, and moral welfare of these Children pursuant to 42 Pa.C.S.A. § 6351(g).

## CONCLUSION

Here, the totality of the evidence supports this Court's conclusion that Termination of Mother's Parental Rights and a Goal of Adoption is in the Children's best interest. At the conclusion of the Hearing, the Court stated:

> As to Mother, of course, has had some contact with the children. There is some discrepancy in the testimony, and any discrepancy is resolved in favor of the department because the department's evidence is more believable, more weighty and more critical. And it establishes that, throughout the life of the placement of these children, that Mother has occasionally reached out, but for the most part, she's ignored the services that were available, has declined the services that were available, and has never asked that any services be given to her to create an ongoing, lasting parental relationship.

> As such, her relationship with the children is now one of an acknowledgment of her motherhood, but there is no real parental relationship between Mother and these children. They recognize her when they see her, on the infrequent times that they do see her. Her visitation is one of minimal compliance. Her compliance with all the goals set forth, and clearly communicated to her, is minimal, and almost none.

> The idea that she can walk into court and tell us she was using an illegal substance a couple of weeks ago and yet she's still in compliance, and all of the times that she was ordered to go from the courtroom, or otherwise, for a screen, she ignored. And the court is permitted to assume that had she been tested, she would've tested positive for illegal substances, therefore creating another impediment to any reunification.

> The lack of any coherent visitation provides further support for Mother's lack of compliance with all the goals set forth for her. I think Mother encapsulated—or the child encapsulated, through the voice of Mr. O'Connor, the primary issue in the case, and that is that Mother expects these children to wait until she gets her act together. I'm using the words of the child. And the Supreme Court has addressed this issue on many occasions. It said that—well,

let me rephrase. The exact words—and I put it down in quotes— "if she got it together."

The Supreme Court said that a child may not wait for a mother or parent to, "get it together." The child has a life. The child deserves some stability, deserves some emotional and physical security, deserves well-being, and the mother never put herself in a position to provide that to them. And, if I can use the oft-repeated phrase, "out of the mouth of babies," I think the child completed the –identified this case and encapsulated it for the court.

There is a parental relationship, but the severance of this parental relationship will provide no irreparable harm to these children, and it would be in the best interest that these children are placed permanently with the only caregiver they have ever known for the majority of their life.

Considering the evidence as a whole, 2511 (a)(1), (2), (5) and (8) are established, and 2511 (b) is established, in that there would be no irreparable harm to the children, that it would be in the best interest of the children that Mother's rights be terminated, having terminated any parental interest or rights in this case, the goal is now changed to adoption. (N. T., 10/17/2019, p. 69 at 10-25; pp.70-71 at 1-25; p.72 at 1).

For the foregoing reasons, this Court respectfully requests that the Decrees of Involuntary Termination of Mother's Parental Rights and the Permanency Goal Change to Adoption Orders issued by this Court on October 17, 2019, be AFFIRMED.

BY THE COURT:

_____
ALLAN L. TERESHKO, Sr. J.

12-12-19

DATE

20

## CERTIFCATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing OPINION dated December 12, 2019, has been served upon the following parties by the manner as designated:

**Family Court Mailbox**

John J. Capaldi, Esq.
Counsel for Appellant, A.L., Mother

Michael Pratt, Esq.
Counsel for DHS

Lawrence J. O'Connor, Jr., Esq.
Child Advocate for Children, N.C.L. and N.D.S

Jeffrey C. Bruch, Esq.
GAL for Children, N.C.L. and N.D.S.

Craig B. Sokolow, Esq,
Counsel for T.S., Father of N.C.L.

Deborah A. Fegan, Esq.
Counsel for D.S., Father of N.D.S.


ALLAN L. TERESHKO, SP.JVDC

Dec. 12, 2019
**DATE**